34 A.3d 1

**Shamell SAMUEL–BASSETT on Behalf of Herself and All Others Similarly Situated, Appellees**

v.

**KIA MOTORS AMERICA, INC., Appellant.**

**Shamell Samuel–Bassett on Behalf of Herself and All Others Similarly Situated, Appellees**

v.

**Kia Motors America, Inc., Appellant.**

**Shamell Samuel–Bassett on Behalf of Herself and All Others Similarly Situated, Appellees**

v.

**Kia Motors America, Inc., Appellant.**

Supreme Court of Pennsylvania.

Argued April 15, 2009.

Decided Dec. 2, 2011.

374

376

378

380

384

Michael Coren, Pellettieri, Rabstein & Altman, Judith Spainer, Abbey Spanier Rodd Abrams & Paradis, LLP, Charles Delbaum, National Consumer Law Center, Ira Rheingold, National Association of Consumer Advocates, for Amicus Curiae, National Consumer Law Center.

Maureen Murphy McBride, William H. Lamb, Scot Russel Withers, James C. Sargent, Jr., John J. Cunningham, IV, Lamb McErlane, PC, West Chester, for Kia Motors America, Inc.

James Michael Beck, Dechert LLP, Philadelphia, for Appellant Amicus Curiae, Product Liability Advisory Counsel.

Emily Jane Lawrence, Morgan Lewis & Bockius, L.L.P., Amy Keating, Alicia Downey, Bingham McCutchen, L.L.P., for Appellant Amicus Curiae, Association of International Automobile Manufacturers, Inc. and Alliance of Auto. Man.

Crystal Lynne Brown, Bryan Cave, LLP, for Appellant Amicus Curiae, the Chamber of Commerce of the United States of America.

Michael D. Donovan, Donovan Searles, L.L.C., James A. Francis, Francis & Mailman, P.C., Alan M. Feldman, Feldman, Shepherd, Wohlgelernter, Tanner, Weinstock & Dodig,

Philadelphia, for Shamell Samuel–Bassett on behalf of herself and all others similarly situated.

Michael J. Boni, Philadelphia, Joshua D. Snyder, Bala Cynwyd, Boni & Zack, LLC, for Appellee Amicus Curiae, Community Legal Services of Philadelphia and PA Association of Justice.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, GREENSPAN, JJ.

## *OPINION*

Chief Justice CASTILLE.[1]

█ Appellant, an automobile manufacturer who unsuccessfully defended a class action lawsuit for breach of express warranty, appeals the Superior Court's decision to affirm the certification of the class by the trial court, and the amount of damages and litigation costs awarded to the class. Costs included a significant legal fee, entered pursuant to the Magnuson–Moss Warranty Improvement Act (the "MMWA"), 15 U.S.C. § 2310(d)(2). For the reasons that follow, we affirm in part and reverse in part, with reversal being limited to the lower courts' approval of an enhancement of class counsel's legal fee by application of a risk multiplier to the amount of the lodestar;[2] and we remand to the trial court for adjustment of the attorneys' fee award in accordance with this Opinion.

### *Case History*

Appellee Shamell Samuel–Bassett, on behalf of herself and others similarly situated (the "class"), filed this class action lawsuit in January 2001, in the Philadelphia Court of Common Pleas. Bassett alleged that, in October 1999, she purchased a model year 2000 Sephia from appellant Kia Motors America,

---

1. This matter was reassigned to this author.

2. The lodestar is "the product of reasonable hours times a reasonable rate." *City of Burlington v. Dague,* 505 U.S. 557, 559, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992).

Inc., ("KMA" or the "manufacturer") with an extended warranty of sixty months or 60,000 miles.[3] The purchase contract included the manufacturer's standard warranty clause, which stated that: "[KMA] warrants that your new [Sephia] is free from defects in material and workmanship," subject to several terms and conditions.

According to the complaint, Bassett experienced malfunctioning of her Sephia's brakes within 17,000 miles of use, which manifested as an inability to stop the vehicle, increased stopping distances, unpredictable and violent brake pedal pressures, brake lockup and vibration, and general interference with control of the vehicle. She attributed these manifestations to a defect in the design of the Sephia's brake system causing inadequate heat dissipation, premature wear of the brake pads, and warping of the rotors.[4] KMA's authorized dealerships attempted five repairs on Bassett's vehicle between January and October 2000, replacing brake pads and rotors on four of five occasions. According to Bassett, she sought to rescind her purchase contract but KMA refused her demand. Bassett claimed that, although KMA was aware of the defect in the brake system, KMA failed to correct the defect and failed to honor the warranty by charging her for the required repairs and replacements. Further, Bassett alleged that the defect in the brake system's design was common to all model year 1995 to 2001 Sephias. She claimed that all members of the class experienced premature wear and malfunction of the brakes, needing repairs within the first 20,000 miles of purchase. According to the complaint, all repair attempts were ineffective, most were not covered by

3. KMA is the American division of parent company Kia Motors Corporation ("KMC") of Seoul, Korea. KMA is an organization selling products designed and engineered by KMC in Korea. Notes of Testimony ("N.T."), 5/18/05, Vol. 1, at 81; N.T., 5/23/05, Vol. 1, at 48.

4. The Sephia's brake system was designed as follows: the caliper—a part fixed to the body of the car—forced the brake pads to clamp against the rotor; the rotor was attached to the wheel of the vehicle and rotated along with the wheel. Braking occurred as a result of friction between the surface of the brake pads and the rotor. N.T., 7/15/04, at 147.

KMA under the warranty, and the members of the class incurred damages of a similar nature to Bassett's.

The complaint stated four causes of action: breach of express warranty, breach of implied warranty of merchantability, violation of the MMWA, and violation of the Unfair Trade Practices and Consumer Protection Law ("UTPCPL"). Bassett claimed that each member of the class was entitled to compensatory damages for out-of-pocket repair costs, loss of use costs, loss of resale value, funds for permanent repair of the vehicle, treble damages, and costs of litigation, including legal fees. Finally, Bassett requested an injunction compelling KMA to notify all class members of the potential danger for personal injury deriving from the Sephia's brake defect, and to provide free repair and replacement of the affected brake systems.

In February 2001, counsel for KMA filed a notice to remove the action to the U.S. District Court for the Eastern District of Pennsylvania, invoking that court's diversity jurisdiction. The parties then filed an amended complaint and answer with the federal court. Bassett's amended federal court complaint re-stated the allegations in her original state court complaint, and KMA answered denying all allegations and asserting forty-seven boilerplate affirmative defenses. The manufacturer sought dismissal of the amended complaint. In due course, the district court certified the class on all of Bassett's claims except her UTPCPL claim. *See Samuel–Bassett v. Kia Motors Am., Inc.,* 212 F.R.D. 271 (E.D.Pa.2002). KMA appealed and the U.S. Court of Appeals for the Third Circuit, which raised the issue of jurisdiction *sua sponte,* vacated the lower court's certification decision, and remanded for a determination of whether the parties met the amount in controversy required to establish diversity jurisdiction. *See Samuel–Bassett v. Kia Motors Am., Inc.,* 357 F.3d 392 (3d Cir.2004). In light of the Third Circuit's decision, the parties agreed that the jurisdictional requirement had not been satisfied and, on April 8, 2004, the district court remanded the case to the Philadelphia County Court of Common Pleas.

Following remand, in May 2004, Bassett filed her motion for class certification with the Philadelphia Court of Common Pleas. Bassett's motion for class certification filed in state court simply incorporated by reference the motion she originally filed in federal court. *Compare* Pa.R.C.P. Nos. 1702.1708 *with* Fed.R.Civ.P. 23(a)(b). In September 2004, the trial court granted Bassett's motion for class certification in part. The court certified the following class as to the breach of express warranty, breach of implied warranty of merchantability, and MMWA claims:

All residents of the Commonwealth of Pennsylvania who purchased or leased model year 1995–2001 Kia Sephia automobiles for personal, family or household purposes for a period of six years preceding the filing of the complaint in this action.

Certification Order, 9/17/04, at 1. Following discovery, the parties stipulated that KMA did not begin selling the Sephia in the United States until 1997. Bassett also conceded that the 2001 model Sephia had undergone substantial redesign that corrected the alleged brake defect. Consequently, the class was limited to purchasers of 1997 to 2000 Sephias. Class certification was denied as to the UTPCPL claim, and Bassett was permitted to proceed alone on that count. Bassett was designated class representative and her attorneys were appointed counsel for the class. Subsequently, KMA asked the trial court to certify the September 17, 2004, order granting class certification for interlocutory appeal, but its request was denied in November 2004.

Bassett notified the class of the action against KMA. The parties then filed various motions *in limine* and proposed findings of fact in anticipation of trial. In addition, KMA filed a motion to bifurcate, which the trial court denied. Tr. Ct. Order, 5/16/05. Subsequently, the parties proceeded to trial.

The trial took place between May 16 and May 27, 2005. At the conclusion of Bassett's case, KMA moved for compulsory nonsuit, but the court denied the motion. Notes of Testimony ("N.T."), 5/23/05, Vol. 5, at 55–60. KMA renewed its request for summary relief at the end of its case, moving for a directed

verdict on the warranty and MMWA claims. After argument, KMA withdrew its request in part, and the trial court denied the remainder of the motion.[5] N.T., 5/25/05, Vol. 7, at 13–28. On May 27, 2005, the jury rendered a verdict in favor of the class on the claim for breach of express warranty and awarded damages in the amount of $600 per class member. The court molded the verdict to account for the 9,402 class members to which the parties had stipulated, and recorded a verdict of $5,641,200. Subsequently, the trial court denied the class's request for injunctive relief.

On June 10, 2005, KMA—represented by new counsel—filed a post-trial motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. *See* Pa.R.C.P. No. 227.1. On September 26, 2005, the trial court held a hearing on KMA's motion, at the end of which it directed the manufacturer to file an addendum indicating where issues raised in the motion had been preserved; KMA complied. The trial court issued no further order to dispose of the request for post-trial relief within 120 days of filing and, therefore, upon praecipe of the class, the prothonotary entered judgment on the molded jury verdict on October 25, 2005. *See* Pa.R.C.P. No. 227.4(1)(b). KMA appealed the judgment to the Superior Court and the class filed a cross-appeal.[6] In December 2005, the trial court ordered the parties to file concise statements of matters complained of on appeal. Pa.R.A.P. 1925(b). Both parties complied with the trial court's order in a timely manner and the court issued its Rule 1925(a) opinion on December 29, 2006.

5. After closing remarks, the parties stipulated that in the event the jury rendered a verdict in favor of the class on the breach of warranty and MMWA claims, Bassett's individual recovery would be trebled under the UTPCPL up to $10,000, without the necessity for separate proof. The parties also agreed that Bassett would not file a request for legal fees separate from the class. Stipulated Order (UTPCPL Claim), 5/25/05.

6. Bassett appealed the decision of the trial court to deny certification of the UTPCPL claim and the Superior Court affirmed. *See* Super. Ct. Op., 10/24/07, at 5 (citing *Debbs v. Chrysler Corp.*, 810 A.2d 137 (Pa.Super.2002)). Bassett did not seek allowance of appeal in this Court. No UTPCPL-related issue is before us.

In parallel, on June 6, 2005, Bassett filed a motion for attorneys' fees. After several postponements, the trial court held a hearing on the motion on September 13, 2005. In January 2006, the court granted the motion and awarded class counsel $4,125,000 in fees, and $267,513 in costs and expenses of litigation. KMA separately appealed this order to the Superior Court in February 2006.

In October 2007, the Superior Court addressed the parties' initial cross-appeals, affirming the lower court's decision with respect to the class action verdict on the basis of the trial court's Rule 1925(a) opinion. *See Samuel–Bassett v. Kia Motors Am., Inc.*, No. 3048 EDA 2005, at *2–5, 944 A.2d 811 (Pa.Super. Oct. 24, 2007). However, the Superior Court remanded for a supplemental Rule 1925(a) opinion on KMA's challenge to the award of legal fees. The trial court filed its supplemental Rule 1925(a) opinion in November 2007 and, in February 2008, the Superior Court affirmed in a brief unpublished decision, extensively quoting from the trial court's opinion. *See Samuel–Bassett v. Kia Motors Am., Inc.*, No. 537 EDA 2006, at *3–7, 951 A.2d 1225 (Pa.Super. Feb. 8, 2008). KMA filed petitions for allowance of appeal from the Superior Court's October 2007 and February 2008 decisions.

We granted allocatur and consolidated the appeals to address the following issues, as stated by KMA:

1. Whether, in an issue of first impression, the lower courts disregarded class action procedures and fundamental principles of Pennsylvania contract law by presuming that a class action could be pursued based solely on proof of breach of the named plaintiff's individual express limited warranty contract, as evidence of proof of breach as to all other limited warranty contracts for all the other members of the class?

2. Whether long-standing Supreme Court precedent requires reversal of the judgment improperly entered and affirmed in favor of all class members, in circumstances where the trial court accepted proof of breach of the named plaintiff's express limited warranty contract as proof of breach as to all limited warranty contacts as to all other

members of the class, even where the only class-wide evidence was that the defendant had honored its express warranty?

3. Whether, in an issue of first impression, the trial court violated the defendant's due process rights by entering judgment for the entire range of class members without requiring proof of breach of all of their express limited warranty contracts?

4. Whether as a matter of first impression, an attorneys' fee award made pursuant to the [MMWA] cannot be entered after entry of judgment where: (i) the MMWA requires that fee awards be entered as "part of the judgment," and where (ii) Plaintiff voluntarily took judgment on the underlying verdict, and thus disposed of all claims (including the Plaintiff's unresolved claim for attorneys' fees) before the trial court entered the fee award?

5. Whether under Pa.R.A.P. 1701, a trial court lacks jurisdiction to enter a fee award after judgment has been entered and a notice of appeal has been filed?

6. Whether, as a matter of first impression, the courts of Pennsylvania are required to follow United States Supreme Court precedent regarding the interpretation of federal fee shifting statutes when interpreting the fee shifting provision of the MMWA, and, if so, whether the trial court's decision to add a $1 million "risk multiplier" bonus to the fee award violates controlling United States Supreme Court precedent?

*Samuel–Bassett v. Kia Motors Am., Inc.,* 598 Pa. 104, 954 A.2d 565 (2008); *Samuel–Bassett v. Kia Motors Am., Inc.,* 598 Pa. 105, 954 A.2d 566 (Pa.2008).[7] Shorn of the argumentative framing by KMA, we view these issues as raising five narrow and distinct questions that we will address individually: 1) whether the class was properly certified; 2) whether evidence

7. In their appellate briefs, both KMA and the class address issues 1 and 2 together, and also 4 and 5 together. We will address questions 4 and 5 together because they raise substantially the same issue. However, we will address issues 1 and 2 separately as they raise distinct issues, as will become apparent from our analysis, *infra.*

was sufficient to support the jury's verdict and whether the verdict was against the weight of the evidence; 3) whether the jury's verdict was properly molded to account for the 9,402 members of the class; 4) whether the trial court had authority to award attorneys' fees after Bassett entered judgment on the class verdict; and 5) whether the risk multiplier was properly applied to an award of counsel fees under the MMWA.[8]

## I. Class Certification

KMA's first claim is that the trial court certified the class in error because Bassett failed to prove: that questions of law and fact were common to the class, that the common questions predominated over individual issues, that Bassett's claims were typical of the class claims, and that Bassett was an adequate class representative.

Class certification presents a mixed question of law and fact. *Liss & Marion, P.C. v. Recordex Acquisition Corp.*, 603 Pa. 198, 983 A.2d 652, 663 (2009) (*"Liss "*). The trial court is vested with broad discretion in deciding whether an action may be pursued on a class-wide basis and, where the court has considered the procedural requirements for class certification, an order granting class certification will not be disturbed on appeal unless the court abused its discretion in applying them. *Id.; Kelly v. County of Allegheny*, 519 Pa. 213, 546 A.2d 608, 610 (1988). *See also In re Community Bank of Northern Virginia*, 622 F.3d 275, 290 (3d Cir.2010). An abuse of discretion will be found if the certifying court's "decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact;" the trial court must have "exercised unreasonable judgment, or based its decision on ill will, bias, or prejudice." 622 F.3d at 290; *In re E.F.*, 606 Pa. 73, 995 A.2d 326, 329 (2010). *See also Twp. of Exeter v. Zoning Hearing Bd. of Exeter Twp.*, 599 Pa. 568, 962 A.2d 653, 659 (2009). The existence of evidence in the record that would support a result contrary to that reached by the

8. The record will be developed further *infra*, as necessary to resolve the issues on appeal.

certifying court does not demonstrate an abuse of discretion by that court. *In re E.F.*, 995 A.2d at 329. In deciding whether class action procedural requirements were misapplied or "an incorrect legal standard [was] used in ruling on class certification," we review issues of law subject to plenary and *de novo* scrutiny. *See Delaware County v. First Union Corp.*, 605 Pa. 547, 992 A.2d 112, 118 (2010).

■■■■ For the trial court, the question of whether a class should be certified entails a preliminary inquiry into the allegations of the putative class and its representative, whose purpose is to establish the identities of the parties to the class action. Pa.R.C.P. No. 1707 cmt. (certification process "is designed to decide who shall be the parties to the action and nothing more"). *See generally Liss*, 983 A.2d at 663; *Bell v. Beneficial Consumer Disc. Co.*, 465 Pa. 225, 348 A.2d 734, 739 (1975). As a practical matter, the trial court will decide whether certification is proper based on the parties' allegations in the complaint and answer, on depositions or admissions supporting these allegations, and any testimony offered at the class certification hearing. *See* Pa.R.C.P. No. 1707 cmt. The court may review the substantive elements of the case only "to envision the form that a trial on those issues would take." *Hohider v. United Parcel Serv.*, 574 F.3d 169, 175–76 (3d Cir.2009); *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 165–68 (3d Cir.2001); *Debbs v. Chrysler Corp.*, 810 A.2d 137, 154 (Pa.Super.2002) (perceived adequacy of underlying merits of a claim should not factor into certification decision). Any "consideration of merits issues at the class certification stage pertains only to that stage; the ultimate factfinder, whether judge or jury, must still reach its own determination on these issues" at the liability stage. *In re Hydrogen Peroxide Antitrust Litigation*, 552 F.3d 305, 320 n. 22 (3d Cir.2008). Even if the class is certified, before a decision on the merits, the certification order "may be revoked, altered or amended by the court on its own motion or on the motion of any party." Pa.R.C.P. No. 1710(d). *See Janicik v. Prudential Ins. Co.*, 305 Pa.Super. 120, 451 A.2d 451, 454–55 (1982) (court has extensive powers to protect

absent class members and to ensure efficient conduct of class action).

Pursuant to Pennsylvania's civil procedure rules, the trial court may allow a representative to sue on behalf of a class if, the class is numerous ("numerosity"); there are questions of law or fact common to the class ("commonality"); the claims of the representative are typical of the class ("typicality"); the representative will fairly and adequately protect the interests of the class ("adequate representation"); and a class action is a fair and efficient method for adjudicating the parties' controversy, under criteria set forth in Rule 1708. Pa.R.C.P. No. 1702. Among the Rule 1708 criteria for determining whether the class action is a fair and efficient method of adjudication is "whether [the] common questions of law or fact predominate over any question affecting only individual members" ("predominance"). Pa.R.C.P. No. 1708(a)(1) (also listing six factors in addition to predominance). The class "is in the action until properly excluded" by, *e.g.*, an order of court refusing certification or an order de-certifying the class. Pa.R.C.P. No. 1701(a) & cmt.; *Bell*, 348 A.2d at 736 (same).

During certification proceedings, the proponent of the class bears the burden to establish that the Rule 1702 prerequisites were met. *Kelly*, 546 A.2d at 612. The burden is not heavy at the preliminary stage of the case. *Clark v. Pfizer Inc.*, 990 A.2d 17, 24 (Pa.Super.2010). Indeed, evidence supporting a *prima facie* case "will suffice unless the class opponent comes forward with contrary evidence; if there is an actual conflict on an essential fact, the proponent bears the risk of non-persuasion." *Id.; Debbs*, 810 A.2d at 153–54; *Baldassari v. Suburban Cable TV Co.*, 808 A.2d 184, 191 (Pa.Super.2002), *appeal denied*, 573 Pa. 694, 825 A.2d 1259 (2003); *Cambanis v. Nationwide Ins. Co.*, 348 Pa.Super. 41, 501 A.2d 635, 637 (1985). It is essential that the proponent of the class establish requisite underlying facts sufficient to persuade the court that the Rule 1702 prerequisites were met. *Kelly*, 546 A.2d at 612.

The trial court prepared a certification memorandum dated September 17, 2004, explaining its class certification decision ("Certification Memo."), and addressing each disputed issue, of commonality, predominance, typicality, and adequacy of representation, as follows. First, respecting commonality, the trial court noted that the theory of liability of the putative class centered on KMA selling one vehicle "with a uniformly defective braking system that affected all drivers" and on KMA's unsuccessful attempts to remedy the defective vehicles in a similar manner, *i.e.,* by replacing brake pads and rotors every few thousand miles. The court listed the common questions of law identified in the complaint, which included whether the Sephias possessed the brake system defect alleged; whether KMA lacked the means to repair the defect; whether the defect constituted breach of express and implied warranties and violation of the MMWA; and whether members of the class were entitled to actual damages and/or an injunction. The court found that sufficient evidence of record supported Bassett's allegations that KMA knew its Sephia vehicles required premature and frequent replacement of brake pads and rotors. According to the court, with the evidence offered, Bassett met her burden of proof for class certification with regard to three claims: breach of express warranty, breach of implied warranty, and violation of the MMWA. Certification Memo., 9/17/04, at 7 (citing *Weismer v. Beech–Nut Nutrition Corp.,* 419 Pa.Super. 403, 615 A.2d 428, 431 (1992): *Janicik, supra*).[9] The trial court was also persuaded that common questions outweighed individual questions of law and fact, and rejected KMA's claims that the proposed class included owners of Sephias with several brake design models, and that individual driving habits, road conditions, and other causes could not be excluded as proximate causes for any harm suffered by the putative class members. *See* Pa.R.C.P. No. 1708(a)(1); Certification Memo., 9/17/04, at 7–8 (citing *Weis-*

9. The trial court denied class certification as to appellee's fourth count on the ground that reliance was an element of any UTPCPL claim and class-wide evidence was not apt to prove reliance. Certification Memo., 9/17/04, at 10 (citing *Weinberg v. Sun Co.,* 565 Pa. 612, 777 A.2d 442 (2001)).

*mer, supra;* *D'Amelio v. Blue Cross of Lehigh Valley,* 347
Pa.Super. 441, 500 A.2d 1137 (1985)). Respecting the typicality requirement of Rule 1702, the court agreed with Bassett
that her claims indeed were typical of the class. Certification
Memo., 9/17/04, at 13–14 (citing *DiLucido v. Terminix Int'l
Inc.,* 450 Pa.Super. 393, 676 A.2d 1237, 1242 (1996)).

Finally, with regard to the adequacy of representation
prong, the trial court concluded that, contrary to KMA's
arguments, Bassett did not have a conflict of interest in the
maintenance of the class, and that her financial resources and
legal representation were adequate. Specifically, the court
rejected KMA's claim that Bassett was an inadequate representative because she had a conflict of interest arising from
potential, not-yet-asserted Lemon Law and personal injury
claims (resulting from a brake-related accident) that other
class members did not share. The court concluded that,
instead, Bassett's personal injury made her "a more zealous
advocate on behalf of the class." Certification Memo., 9/17/04,
at 14–16 (citing *Janicik, supra* ).

The trial court further addressed class certification issues in
its Pa.R.A.P. 1925(a) opinion. In addition to incorporating by
reference its September 2004 certification memorandum, the
court stated that the evidence introduced at trial confirmed
that a class action was the most appropriate means to present
the class's claims, that class counsel was able to present the
issues to the jury fully, and that the jury was able to decide all
issues before them "sincerely, productively, appropriately and
justly." According to the court, separate trials on the 9,402
claims of the class members, claiming damages of only $600
each, would have placed a strain on the courts and effectively
"seal[ed] shut" the doors to the courtroom in violation of the
Pennsylvania Constitution. The effect would have been a
windfall for KMA as numerous class members failed to bring
their cases to trial. The court concluded that the class had
met the Rule 1702 and 1708 prerequisites for class certification, and relied on its September 2004 opinion for analysis of
the individual certification issues.

On appeal to this Court, KMA argues that Bassett failed to establish that common questions of law and fact existed, that these common issues predominated over individual issues, that her experience was typical of the class, and that she was an adequate representative of the class.

## A. Commonality and Predominance

KMA claims that Bassett did not meet either the commonality or the predominance prerequisites for certifying the class, raising the same arguments in support of both claims. According to KMA, the trial court certified the class on a record that contained proof of Bassett's "anecdotal" experience but no evidence that KMA had breached its express warranty with respect to all class members or that the class members sustained out-of-pocket costs as a result.[10]

KMA states that to prove liability for breach of express warranty, Bassett had to submit evidence for each absent class member. KMA states that Bassett's evidence of her personal experience, expert testimony and internal documents regarding a defect present in all 1997–2000 Sephias, and warranty brake repair data were not probative to satisfy Bassett's burden of proof with regard to all the elements of a breach of warranty cause of action for the class. Without specifying whether it is addressing the certification hearing or the trial testimony, KMA attacks Bassett's evidence as not credible and not probative. Thus, KMA challenges the conclusion of Bassett's expert witness that the Sephias suffered from a common defect, on the basis that he personally inspected only two vehicles rather than all the vehicles in the class. According to KMA, warranty repair statistics did not cure any deficiencies in the expert's testimony regarding the existence of a defect and, instead, showed only that "KMA honored its express warranty" by routinely covering brake repairs to Sephia vehicles.

Moreover, KMA argues that reliance, manifestation, notice, and opportunity to cure are elements of proof in a breach of

10. The jury found in favor of the class on the breach of express warranty and KMA's appeal addresses that claim only.

express warranty action, and that Bassett failed to prove them with respect to the class claims. According to KMA, Bassett was required to produce evidence that each absent class member was aware of and relied on KMA's express warranty, yet the record lacks any such proof respecting class members other than Bassett. KMA's Brief at 19–20 (citing *Goodman v. PPG Indus., Inc.,* 849 A.2d 1239, 1245–46 (Pa.Super.2004), *aff'd per curiam,* 584 Pa. 537, 885 A.2d 982 (2005) (buyers could not enforce warranty made by third party to seller)). KMA also argues that Bassett offered no evidence that each class member notified KMA of a covered defect, provided opportunity to cure, or that KMA failed or refused to cure the brake defect. *Id.* at 20–22 (citing 13 Pa.C.S. § 2607(c)(1) ("buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy")). KMA reiterates that simply proving the existence of a defect based on consumer expectations of brake pad longevity is insufficient evidence that KMA breached its express, rather than an implied, warranty. *Id.* at 20–21 (citing *Olson v. Ford Motor Co.,* 258 Ga.App. 848, 575 S.E.2d 743, 746 (2002) (dealership not liable to plaintiff who refused to let dealership repair vehicle); *Hasek v. DaimlerChrysler Corp.,* 319 Ill.App.3d 780, 253 Ill. Dec. 504, 745 N.E.2d 627, 638 (2001) (engine noise, without further indication of defect, is not enough to establish liability for breach of express warranty); *Poli v. DaimlerChrysler Corp.,* 349 N.J.Super. 169, 793 A.2d 104, 110–11 (Law Div. 2002) (buyer's breach of warranty claims did not accrue until manufacturer failed to perform repair within reasonable time)). Finally, KMA argues that Bassett failed to prove that each absent class member sustained damages caused by the defect, or any damages at all. *Id.* at 22–23 (citing *Price v. Chevrolet Motor Div.,* 765 A.2d 800 (Pa.Super.2000) (buyer must prove that alleged defect is proximate cause of damages)). According to KMA, Bassett's damages were unique and she did not attempt to extrapolate her experience to the entire class or to prove individual damages. KMA insists that Bassett's evidence on damages was theoretical and focused on the cost of retrofitting all vehicles in the class. KMA con-

cludes that Bassett failed to establish "the critical elements of any breach of express warranty claim" and, therefore, that the class was improperly certified "in the first instance."

Bassett responds first with a waiver argument. Bassett claims that KMA waived all certification issues by failing to object on the trial court record and distinguish express warranty issues from implied warranty issues for certification purposes. According to Bassett, KMA contested certification as to all claims, "hoping as a matter of strategy to obtain the same *res judicata* benefit it now claims for the implied warranty claim." Our review, however, reveals that KMA raised and preserved issues related to certification of the class with respect to all of Bassett's claims on behalf of the class. Therefore, KMA's claims related to the express warranty were not waived, even if they were not addressed separately from implied warranty claims, and regardless of KMA's strategy.[11]

On the merits, Bassett argues that consumer product warranty claims are recognized as "particularly suitable" for class litigation. Bassett's Brief at 14 (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (predominance is "readily met" in certain cases alleging consumer fraud) and 15 U.S.C. § 2310(e) (establishing separate notice and opportunity to cure procedures for class actions)). According to Bassett, warranty data showing high

---

11. We also reject Bassett's additional arguments in the same vein. Thus, in her "Counter-statement of the case," Bassett asserts three claims that KMA either waived or is judicially estopped from challenging class certification on the merits because: (1) KMA implemented a free brake repair program limited to a subset of the class members and, therefore, admitted the existence of the class; (2) KMA admitted that certification was proper by filing a motion for "temporary" certification of a class in *Leger v. Kia Motors America, Inc.*, No. CV–04–80522, a case pending in the District Court for the Middle District of Florida; and (3) KMA stipulated to class certification in *Santiago v. Kia Motors America, Inc.*, No. 01 CC 01438, 2004 WL 5521781 (Cal.Super. Ct. May 24, 2004), a 47–state class that did not include Pennsylvania. But, Bassett does not address or develop these assertions in the body of the brief. As a result, Bassett waived these claims. *Purple Orchid, Inc. v. Pa. State Police*, 572 Pa. 171, 813 A.2d 801, 804 (2002) (issue included in "statement of questions" was waived by failure to address and develop in appellate brief).

percentage rates of covered brake repairs was *prima facie* proof that all 1997–2000 Sephias experienced a premature wear defect. Further, deposition testimony from KMA executives, KMA internal documents, and a "coupon" program, through which KMA offered free brake repairs to members of the class, showed that KMA recognized the 1997–2000 Sephias as suffering from a model-wide defect. Bassett states that KMA did not require individual inspections of each Sephia, nor inquiry into individual drivers' habits, as a prerequisite to qualify for its coupon program, proof that KMA discounted their role in revealing the causes of customer complaints. Bassett claims that KMA also did not limit the program to select iterations of the 1997–2000 Sephia models, in recognition that any modifications or "tweaks" of the brake system did not alter the basic defective design.

Bassett argues that she proved that each class vehicle manifested the defect by showing that the abnormal degradation of the brake pads and rotors was measurable. KMA's business records, *i.e.,* warranty data and internal memoranda, showed that the defect was measured, tested, and ultimately recognized internally by KMA. Thus, Bassett asserts, warranty data supported the commonality and predominance allegations, regardless of whether the same data also showed that KMA complied with its warranty promises, a fact relevant to KMA's liability but not a factor for the court to consider for certification purposes.

According to Bassett, KMA did not object to or introduce evidence to rebut Bassett's commonality evidence. Bassett notes that KMA's appeal strategy is different from its trial argument: at trial, KMA sought to prove that a common defect did not exist but, on appeal, KMA is claiming that existence of a defect is irrelevant. Bassett emphasizes that, at trial, KMA "recognized" that it was replacing one set of defective brakes with another and, therefore, that warranty repairs did not restore the Sephias to a defect-free condition. But, Bassett adds, on appeal, implicit in the jury's verdict is a finding that commonality existed so there is no basis to overturn the certification decision.

Bassett also argues that common issues predominated over any individual issues. Common issues included whether KMA met its express promise to deliver vehicles free from defect; whether the Sephias had a braking system design defect; and whether the design defect manifested as abnormal or premature wear of the brakes. According to Bassett, these issues were essential to proving the warranty claims and were properly supported with generalized proof.

Next, Bassett responds to KMA's assertion that evidence of individual reliance is necessary to prove breach of warranty and is not amenable to generalized proof. According to Bassett, reliance is not an element of proof in a warranty action because the written warranty is an affirmation of fact and part of the basis of the bargain. Bassett's Brief at 29 (citing *Liberty Lincoln–Mercury, Inc. v. Ford Motor Co.*, 171 F.3d 818, 825 & n. 7 (3d Cir.1999) (not all promises are warranties; to be a warranty, promise must be part of basis of bargain and reliance may become factor in determining whether promise is part of basis of bargain)). Bassett states that the burden was, therefore, on KMA to prove that the written warranty was not part of the bargain and did not cover the defective condition of which class members complained. *Id.* (citing 13 Pa.C.S. § 2313 cmt. 3 (seller's affirmations of fact about goods during bargain become part of description, hence no particular reliance need be shown to weave them into agreement; rather, fact which takes affirmations out of agreement requires clear affirmative proof)). Here, according to Bassett, KMA did not offer any proof that class members disregarded the warranty and reliance was not an issue. Bassett states that the cases cited by KMA in support of a contrary legal conclusion are inapposite because they do not address the issue of reliance but merely whether express warranties existed in fact-specific circumstances. *Id.* at 30 (citing *Goodman, supra* ).

Bassett also rejects KMA's arguments that each class member was required to provide individual notice of the common defect, opportunity to cure, and to establish failure to repair in order for the class to maintain suit. According to Bassett,

KMA "received ample notice" that the Sephias' brakes were defective from consumer complaints, warranty claims, and internal records; thus, individual notice prior to suit was not required. *Id.* at 31–32 (citing *In re Latex Gloves,* 134 F.Supp.2d 415, 422 (E.D.Pa.2001), *vacated in part on diff. grounds, Whitson v. Safeskin Corp.,* 2001 WL 34649695 (E.D.Pa. Apr. 6, 2001) (whether buyer provided notice within reasonable time to seller via complaint, which was filed two years after discovery of injury, is issue for finder of fact)). Indeed, Bassett argues that the MMWA did not require notice to KMA on behalf of the class and an opportunity to cure until after certification of the class. *Id.* at 32 (citing 15 U.S.C. § 2310(e) (class of consumers may not proceed on breach of warranty claim except to establish representative capacity of named plaintiffs, unless warrantor "is afforded a reasonable opportunity to cure" failure to comply with warranty; named plaintiffs shall notify defendant that they are acting on behalf of class at that time)). Additionally, Bassett claims that she notified KMA of the class's claim in timely fashion, which led KMA's counsel to withdraw a motion for directed verdict after trial. *See* N.T., 5/25/05, Vol. 7, at 26–27.

Finally, Bassett responds to KMA's argument that her evidence of damages at trial was inadequate because individual out-of-pocket costs of repair were not demonstrated. Bassett states that KMA's current argument on this issue highlights the difference in posture at the time of class certification, when Bassett was asserting that the class action mechanism was appropriate, versus on appeal, when KMA is attacking a completed trial as improper. Bassett emphasizes that her expert's testimony at trial, and KMA's records, substantiated the request for per person damages, to which KMA had a full opportunity to object but did not. Furthermore, according to Bassett, the jury's award was supported by the evidence at trial.

In its reply brief, KMA reemphasizes that the existence of a common defect "is not the answer to the question of whether the class was properly certified" but merely a threshold fact. KMA also states that Bassett's arguments ignore evidence

that among the 1997–2000 Sephias, KMA introduced thirteen separate design changes to the brakes and that not simply one automobile model was at issue.

Preliminarily, to better focus the dispute, we address the proper scope of our review of the trial court's decision to certify the class. "Scope of review refers to the confines within which an appellate court must conduct its examination ... [or] to the matters (or "what") the appellate court is permitted to examine." *Morrison v. Commonwealth,* 538 Pa. 122, 646 A.2d 565, 570 (1994); *see generally* Jeffrey P. Bauman, *Standards of Review and Scopes of Review in Pennsylvania—Primer and Proposal,* 39 Duq. L.Rev. 513 (2001). Both parties here offer extensive argument about whether the trial court's decision to certify was proper in view of evidence offered during the liability phase of trial. But, as stated, a certification proceeding is a preliminary inquiry whose purpose is to establish who the parties to the class action are "and nothing more." Pa.R.C.P. No. 1707 cmt. Bassett was not required to prove KMA's liability at the certification stage and the trial court was prohibited from factoring the perceived adequacy of the underlying merits of the class's claims into the certification decision. *Debbs,* 810 A.2d at 154; *see Hohider,* 574 F.3d at 175–76.

An appellate court does not second-guess a trial court's discretionary "preliminary" decision to certify the class by considering subsequent case developments of which the trial court could not have been aware at the time of its decision. Thus, arguments regarding subsequent case developments, such as evidence revealed at the liability phase of trial or the jury's verdict, cannot prove an abuse of discretion at the certification stage.[12] By the same token, pre-trial class

12. Of course, the rules of civil procedure anticipate that evidence available after certification but before a decision on the merits may be considered by the trial court, and consequently by the appellate courts, in deciding whether revocation of the class certification is proper. Pa.R.C.P. No. 1710(d); *see Basile v. H & R Block, Inc.,* 601 Pa. 392, 973 A.2d 417, 423 (2009) (filing of decertification motion appropriate before decision on merits, if circumstances change following certification decision); *Clark v. Pfizer Inc.,* 990 A.2d 17, 29 (Pa.Super.2010) (same).

certification proceedings do not require a mini-trial; the class is not obligated to establish liability during the class certification phase. Pa.R.C.P. No. 1707 cmt.; *Debbs*, 810 A.2d at 154. *See Hohider*, 574 F.3d at 175–76. The practical consequence here is that we address the first and second questions on appeal, class certification and sufficiency, separately. But, because the parties have unhelpfully addressed the issues together, we have parsed the briefs to separate the arguments relevant to each issue.

■■■ For ease of discussion, we will address commonality and predominance together as the parties do, but we emphasize that the Rule 1702(2) commonality requirement and the Rule 1708(a)(1) predominance requirement are distinct prerequisites for class certification, both of which must be established by the class proponent.

■■■ To establish the commonality requirement, Bassett had to identify common questions of law and fact—"a common source of liability." *Weismer*, 615 A.2d at 431. Simply contending that all putative members of a class have a complaint is not sufficient if the complaints are disparate personal allegations arising from different circumstances and requiring different evidence, *i.e.*, "one requiring less, the other requiring more, the one not indicative of the merits, the other appearing to approach the merits of individual cases." *Allegheny County Hous. Auth. v. Berry*, 338 Pa.Super. 338, 487 A.2d 995, 996–98 (1985) (commonality requirement not met with bare allegation that a number of plaintiffs had different verifiable complaints against same defendant); *see Eisen v. Indep. Blue Cross*, 839 A.2d 369, 372 (Pa.Super.2003) (same). Commonality may not be established if "various intervening and possibly superseding causes of damage" exist. *Weismer*, 615 A.2d at 431. The critical inquiry for the certifying court is whether the material facts and issues of law are substantially the same for all class members. *Liss*, 983 A.2d at 663. The court should be able to envision that the common issues could

But, here, KMA's issues on appeal do not concern decertification and consideration of post-certification evidence is inappropriate.

be tried such that "proof as to one claimant would be proof as to all" members of the class. *Id.*

▮▮▮▮▮ Bassett was not required to prove that the claims of all class members were identical; the existence of distinguishing individual facts is not "fatal" to certification. *Buynak v. Dep't of Transp.*, 833 A.2d 1159, 1163 (Pa.Cmwlth.2003). The common questions of fact and law merely must predominate over individual questions. Pa.R.C.P. No. 1708(a)(1). The standard for showing predominance is more demanding than that for showing commonality, *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 311, but is not so strict as to vitiate Pennsylvania's policy favoring certification of class actions. *Eisen*, 839 A.2d at 371.

▮▮▮▮▮ The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods.*, 521 U.S. at 623, 117 S.Ct. 2231; *see In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 310–11. Thus, a class consisting of members for whom **most** essential elements of its cause or causes of action may be proven through simultaneous class-wide evidence is better suited for class treatment than one consisting of individuals for whom resolution of such elements does not advance the interests of the entire class. *See Liss*, 983 A.2d at 666 ("[c]lass members may assert a single common complaint even if they have not all suffered actual injury; demonstrating that all class members are subject to the same harm will suffice"); *Delaware County v. Mellon Fin. Corp.*, 914 A.2d 469, 475 (Pa.Cmwlth.2007) (existence of separate questions "essential" to individual claims does not foreclose class certification) (quoting *Weismer*, 615 A.2d at 431); *Cook v. Highland Water & Sewer Auth.*, 108 Pa.Cmwlth. 222, 530 A.2d 499, 505 (1987) (internal citations omitted) ("Where a common source of liability can be clearly identified, varying amounts of damage among the plaintiffs will not preclude class certification. However, where there exist[ ] various intervening and possibly superseding causes of the damage, liability cannot be determined on a class-wide basis.")

■ Here, we do not discern any abuse of discretion in the pre-trial certification decision. The evidence available to the court at the time of certification supported the following findings of fact by the trial court. KMA sold the Sephia to U.S. consumers between 1997 and 2000. N.T., 7/15/04, at 10, 19. Although KMA made several changes to the design of the Sephia's brake system during those years, the modifications did not significantly alter the basic defective design. N.T., 7/15/04, at 86–87, 129; 7/16/04, Vol. 1, at 79–81. According to Bassett's expert, the brake systems of all 1997–2000 Sephias had a common design defect related to heat dissipation in the front brakes, which caused premature wear of the brake pads and rotors. N.T., 7/15/04, at 93, 100–01.[13] Bassett showed U.S. consumer expectations and the KMA owner's manual to set the reasonable life expectancy of Sephia brake pads at 20,000 to 30,000 miles. *Id.* at 94–97. But, the Sephias' brake pads (and, subsequently, rotors) wore prematurely. *See* Motion for Class Certification, Exh. 2–D–I, K (KMA Technical Service Bulletins dated 1997–1999; Sephia Repair Tips (from Kia Technician Times, Apr. 1998)). Warranty data showed high claim rates related to the premature wear of brake pads and rotors for 1997–2000 Sephias, which indicated, according to Bassett's expert, "extra" or "abnormal" wear independent of factors like driver habits and the environment that normally contribute to brake component wear.[14] N.T., 7/15/04, at 98–99, 102, 104. Bassett also offered KMA internal memoranda and

13. The expert stated: "I don't believe that I have been provided with enough ... material to ultimately put my finger on the exact reason why we can't or they can't evacuate the heat. What I am confident in saying is that, and within a reasonable degree of engineering certainty, is that this front brake system cannot evacuate the heat properly." N.T., 7/15/04, at 100.

14. Neil Barbalato, a KMA warranty department representative, reported in an affidavit that of 1997 Sephias, 55% had one or more warranty repairs, of 1998 Sephias, 83% had one or more warranty repairs, of 1999 Sephias, 70–71% had one or more warranty repairs, and of 2000 Sephias, 36% had one or more warranty repairs. Bassett's expert testified that the average claim rate of 61% was ten times higher than that of the Kia Sportage, another KMA vehicle. Notably, the claim rate did not include instances of brake repairs done by Sephia owners or for which Sephia owners paid out of pocket to Kia dealers or to private mechanics. N.T., 7/15/04, at 91–92, 97–98.

evidence of a free brake pad coupon program to confirm the existence of a system-wide brake defect and KMA's knowledge of the defect since 1998. *Id.* at 132; N.T., 07/16/04, Vol. 1, at 48–49 (quoting quality assurance report of June 8, 1999, in reference to premature brake wear and warping of rotors on the Sephia: "This is a well-known condition and needs to be corrected ASAP."); *see also* Motion for Class Certification, Exh. 2–D–I, K (KMA Technical Service Bulletins dated 1997– 1999; Sephia Repair Tips (from Kia Technician Times, Apr. 1998)). Finally, warranty data, internal memoranda, and KMA's repeated attempts to make minor brake system modifications, as explained by expert testimony, supported the trial court's finding that KMA was unable to effectively repair the defect in the brake system. N.T., 7/15/04, at 88 (brake system defect was "chronic"). Thus, the trial court's findings of fact for the purposes of Bassett's class certification motion are supported by the record.

The findings of fact by the certifying court formed a sufficient basis to conclude that commonality was met, as the class's claims were based on "a common source of liability" and were susceptible to common proof. *Liss,* 983 A.2d at 663; *Weismer,* 615 A.2d at 431. KMA warranted Sephias to be "free from defects in material and workmanship." Bassett and the class asserted several causes of action on the basis of the common source of liability (*i.e.,* the defective design of the brake system), including breach of express and implied warranties, and violation of the MMWA. The trial court did not abuse its discretion in concluding that common questions of law and fact existed, such as whether the 1997–2000 Sephias had the common defect alleged, whether KMA had the ability to repair the defect, whether KMA breached the express and implied warranties, and whether KMA violated the MMWA. Based on the same evidence, the certifying court also did not abuse its discretion in concluding that common issues predominated over individual issues of liability.

 KMA's arguments on appeal do not prove an abuse of discretion by the trial court. First, the class here was not required to prove "reliance" in order to recover for

breach of the express warranty.[15] KMA now argues that, to recover, each class member had to prove individually that s/he read the warranty—a clause of the purchase contract—and relied on it in seeking brake repairs and, consequently, in bringing an action for failure to repair. But, it is undisputed that the express and implied warranties at issue existed and were terms in each class member's sales contract. *See* KMA's Warranty ("[KMA] warrants that your new [Sephia] is free from defects in material and workmanship ... all components of your new [Sephia] are covered for 36 months or 36,000 miles, whichever comes first"); *see Keller v. Volkswagen of America, Inc.,* 733 A.2d 642, 644–45 (Pa.Super.1999) (breach of warranty is an action for breach of contract). A written express warranty that is part of the sales contract is the seller's promise which relates to goods, and it is part of the basis of the bargain. 13 Pa.C.S. § 2313(a)(1). This statement of law is not qualified by whether the buyer has read the warranty clause and relied on it in seeking its application. *See id.* General contract law supports this interpretation. "Contracting parties are normally bound by their agreements, without regard to whether the terms thereof were read and fully understood." *Simeone v. Simeone,* 525 Pa. 392, 581 A.2d 162, 165 (1990); *see Erie Ins. Exchange v. Baker,* 601 Pa. 355, 972 A.2d 507, 511 (2008) (plurality) (plaintiff's failure to read contract not ground to nullify contract terms); *Standard Venetian Blind Co. v. Am. Empire Ins. Co.,* 503 Pa. 300, 469 A.2d 563, 566 (1983) (same). To adopt KMA's position would essentially require us to abandon this rule with respect to warranties. We decline to do so. Here, KMA cannot avoid its contractual responsibilities pursuant to the class member warranties, regardless of whether individual members read and fully understood the warranty provisions; therefore, to require class members to prove individual reliance on the written warranties is unnecessary. Accordingly, at the class

15. Notably, during certification proceedings, KMA never argued that certification was inappropriate because Bassett and the class had to show "reliance." Nevertheless, because the class fails to assert waiver on this ground, and the issue is one of law easily resolvable on the existing record, we will pass upon it.

certification stage, Bassett was not required to show that reliance lent itself to class-wide proof. *See Liss,* 983 A.2d at 665 (reliance is not element of cause of action for breach of contract).[16]

 Second, the trial court did not abuse its discretion in concluding that the issue of proximate cause could be proven by common evidence. The court considered KMA's internal memoranda and expert testimony regarding the brake design defect, in conjunction with warranty claims data, which tended to prove that the brake design defect was the proximate cause of premature wear of brake pads and rotors with respect to the class claims. N.T., 7/15/04, at 88–91, 99–102. On appeal, KMA argues that commonality was not established because evidence of record proved that premature wear could also have other causes, such as environmental conditions, driver habits, or separate defects, *id.* at 120–23, 148. We reject KMA's implicit invitation to reweigh the evidence on appeal. *Commonwealth v. Treiber,* 582 Pa. 646, 874 A.2d 26, 30 (2005). Whether causation could be established on a class-wise basis was an issue for the finder of fact—the certifying court, in this case—and contrary testimony in the record is insufficient for reversal on appeal. *See Summers v. Certainteed Corp.,* 606 Pa. 294, 997 A.2d 1152, 1163–64 (2010) (causation is question for finder of fact; plaintiff need not exclude every possible

**16.** In arguing that "reliance" is an element of proof in a warranty action, KMA relies primarily on the Superior Court's decision in *Goodman,* 849 A.2d at 1245–46. In *Goodman,* consumers who purchased windows and doors from a manufacturer sued the manufacturer's supplier of wood preservative for breach of express warranty. The written warranty was part of the contract between the manufacturer and the wood preservative supplier, and extended only to the manufacturer and not to the consumers/plaintiffs. The court dismissed the consumers' breach of warranty claim on the ground that the wood preservative supplier had not warranted the product to the consumers; consumers had not relied on any of the supplier's representations in purchasing the windows from the manufacturer. *Id.* at 1246. *Accord Dormont Mfg. Co. v. ITT Grinnell Corp.,* 323 Pa.Super. 17, 469 A.2d 1138, 1140 (1983) (express warranty not created by buyer's reliance on past sales). The question of whether reliance is required to create a warranty in the first place (the *Goodman* scenario) is distinct from the question of whether a warrantor may be liable for breach to a consumer who did not read the express warranty that is indisputably part of the written contract (present scenario). Therefore, *Goodman* is inapposite.

explanation so long as reasonable minds can conclude that defendant's conduct was proximate cause of harm by preponderance of evidence); *Popowsky v. Pa. Pub. Utility Comm'n,* 594 Pa. 583, 937 A.2d 1040, 1055 n. 18 (2007) (preponderance of evidence is akin to "more likely than not" inquiry); RE-STATEMENT (THIRD) OF TORTS, PRODUCTS LIABILITY § 3 cmt. d (1998) (if plaintiff can prove that most likely explanation of harm involves causal contribution of a product defect, fact that there may be other concurrent causes of harm does not preclude liability).

██ Third, we also reject KMA's claims that certification was an abuse of discretion because the record was devoid of evidence that class members provided notice of the defect and an opportunity to cure.[17] Indeed, the record shows that KMA was on notice since late 1998 (more than two years before this action was filed) that Sephias, beginning with the 1997 model, had defective front brakes. *See, e.g.,* KMA's Opposition to Class Certification, Exh. D2–32 (Tim McCurdy Inter–Office Memorandum to James Lee, 2/03/99; KMC Brake Quality Team Meeting Summary, 2/15/99). KMA had the opportunity

17. Pursuant to the Pennsylvania Commercial Code, notice of breach is required within "a reasonable time." 13 Pa.C.S. § 2607(c)(1). The purpose of providing notice is to defeat commercial bad faith and not to deprive the consumer of her remedy. 13 Pa.C.S. § 2607 cmt. 4. The statute, however, does not provide direction as to what constitutes reasonable notice in the context of a class action. Nor does the statute explicitly require the consumer to provide an opportunity to cure before filing suit for breach of warranty. In spite of KMA's allegations to the contrary, and evident from the caselaw on which KMA relies, the law of this Commonwealth is neither "well-settled" nor self-evident on these issues. KMA's Brief at 17–18, 21 (citing *Beneficial Commercial Corp. v. Brueck,* 23 Pa. D. & C.3d 34, 37 (Pa.Com.Pl.1982) (*"Brueck "*): *Perona v. Volkswagen of Am., Inc.,* 292 Ill.App.3d 59, 225 Ill.Dec. 868, 684 N.E.2d 859 (1997); *Zwiercan v. Gen. Motors Corp.,* 2002 WL 1472335 at *3–4 (Pa.Com.Pl.2002); *Grant v. Bridgestone/Firestone, Inc.,* 57 Pa. D. & C.4th 72, *4–5 (Pa.Com.Pl.2001)). But, without any development of the law it wishes us to follow or adopt, KMA insists that the record is void of any proof of notice and opportunity·to cure. Bassett denies the allegation. Implicit in both parties' arguments is a presumption that some proof of these issues is necessary to establish a claim for breach of warranty. For the purposes of decision, we accept that presumption and reject KMA's contention that no evidence was present in the record. We offer no opinion as to whether KMA's iteration of the law is in fact correct.

(and sought) to repair the defect repeatedly but unsuccessfully during the 1997–2000 production years. On this record, we hold that the trial court did not abuse its discretion by concluding that the class would be able to prove notice and opportunity to cure through common evidence at trial.

As a final matter, KMA argues that common proof for individual class members of the related issues of defect manifestation and amount of damages, *see Briehl v. Gen. Motors Corp.*, 172 F.3d 623, 627–28 (8th Cir.1999), was not available and that the trial court's decision to certify the class was erroneous on this ground. According to KMA, testimony related to Bassett's repair history was insufficient to prove the damages of the other class members and the trial court should have found commonality lacking on this ground. KMA argues that Bassett "made no attempt to extrapolate her experience to those absent class members and offered no documentary or testimonial evidence to establish that any plaintiff class member other than she [sic] sustained *any* economic harm." KMA's Brief at 23.

At issue are two different considerations: whether the class could demonstrate the impact of the defective brakes on each member and whether the amount of damages for each class member was provable with common evidence. *See Behrend v. Comcast Corp.*, 655 F.3d 182, 204–06 (3d Cir.2011) ("At the class certification stage we do not require that Plaintiffs tie each theory of antitrust impact to an exact calculation of damages, but instead that they assure us that if they can prove antitrust impact, the resulting damages are capable of measurement and will not require labyrinthine individual calculations."); *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 188 (3d Cir.2001) (ability to calculate amount of damages "does not absolve plaintiffs from the duty to prove each investor was harmed by the defendants' practice"); *accord Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 565, 51 S.Ct. 248, 75 L.Ed. 544 (1931) ("rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the

wrong and only uncertain in respect of their amount"). The impact of the defect on each class member implicates concepts of manifestation and causation. Impact may be proven with common evidence "so long as the common proof adequately demonstrates some damage to each individual." *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 454 (3d Cir.1977), *abrogated on other grounds by Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The question regarding the impact on each class member turns on the individual facts of a case "rather than upon a rule of law precluding common proof of fact of damage." *Id.* at 454–55; *accord Summers, supra.*

■■■ The design defect of which the class complained was susceptible to proof on a class-wide basis, and testimony showed that the inability of the Sephia brake system to exhaust heat manifested as premature wear of brake pads and rotors, accompanied by noise and inability to brake, symptoms of which Sephia owners complained. High warranty claims confirmed the impact of the defect on individual members of the class. The fact that the claims rates were not one hundred percent across all models was not dispositive of the issue of manifestation because, as KMA's representative testified, only covered claims were included in the calculations of the warranty rate. Uncompensated claims were not. *See* N.T., 7/15/04, at 91–92, 97–98. KMA offered testimony that the decision whether to replace brake pads and rotors, wear-and-tear items generally not covered under the warranty, was at the discretion of KMA. Moreover, Bassett's evidence supported the conclusion that, even where KMA replaced brake system components free of charge, the replacement parts were equally defective and required additional repairs, whose replacement at no cost to the Sephia owners would again be subject to KMA's discretion. Notably, at the preliminary stage of trial, the class was pursuing several types of compensation, including out-of-pocket costs, diminished re-sale value of the vehicle, and retrofit costs. The record following the certification hearing contained sufficient evidence to support

the trial court's decision that all class members were affected by the defect and sustained some form of damages.

Regarding damage amounts or scope of individual relief, it has been well established that if a "common source of liability has been clearly identified, varying amounts of damages among the plaintiffs will not preclude class certification." *Weismer*, 615 A.2d at 431; *accord* 6 Alba Conte & Herbert B. Newberg, NEWBERG ON CLASS ACTIONS § 18:27 (4th ed.2002) (part of federal approach to class actions is "recognition that individual damages questions do not preclude [certification] when the issue of liability is common to the class."). Indeed, as we have recently held, "demonstrating that all class members are subject to the same harm will suffice" for certification purposes. *Liss*, 983 A.2d at 666 (quoting *Baldassari*, 808 A.2d at 191 n. 6); *accord Int'l Bhd. of Teamsters v. U.S.*, 431 U.S. 324, 361, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) (*"Teamsters"*) (authorizing "additional proceedings after the liability phase of the trial to determine the scope of individual relief"); *Smilow v. Southwestern Bell Mobile Sys., Inc.*, 323 F.3d 32, 40 (1st Cir.2003) (if "common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain"). The class here did not offer testimony of identical damages among members during certification proceedings and, in fact, acknowledged that individual class members paid varying out-of-pocket costs for brake repairs. N.T., 7/15/04, at 22–23.

■ KMA argued in opposition to certification—and renews the argument now, on appeal—that the individual nature of damages proves that the trial court abused its discretion in its finding of commonality and predominance. We disagree. As our previous analysis shows, Bassett and the class adduced sufficient evidence during certification proceedings to show a common source of liability. Any question regarding individual expenditures resulting from varying attempts to repair the defect was not a ground to reject the commonality found on other issues, to defeat the predominance of common issues and, ultimately, to deny certification of the class at the prelim-

inary stages of trial.[18] For these reasons, we discern no abuse of discretion by the trial court in concluding that Bassett met the prerequisites of commonality and predominance.

In his dissent, Mr. Justice Saylor addresses damages and observes that class members had "plainly individualized experience[s] with out-of-pocket expenditures," which the trial court "glossed over" both at certification proceedings and at trial. Dissenting Op., at 476, 34 A.3d at 63–64. Justice Saylor criticizes the trial court for failing to manage the class action proceedings fairly and efficiently to account for differences in out-of-pocket damages incurred by the individual class members. *Id.* at 472, 34 A.3d at 62. "The looseness of the certification decision yielded ongoing controversy about how the certification was to operate and its impact on required substantive proofs" at trial. *Id.* at 469, 34 A.3d at 60.

We do not discount the concern of our esteemed colleague. Respectfully, however, in our view, the concern has less power in the context of assessing the trial court's ruling on the commonality and predominance prerequisites for class certification (especially since claims proceedings that account for different damages among class members are not uncommon in class actions), and more power in the overall context of ensuring that the "class action provides a fair and efficient method for adjudication of the controversy under the criteria set forth in Rule 1708." Pa.R.C.P. No. 1702(5). Rule 1708 requires a certifying court to consider, among other factors, whether "the size of the class and the difficulties likely to be encountered in the management of the action as a class action." Pa.R.C.P. No. 1708(a)(2). We agree with Justice Saylor that the approach to the management of individualized damages matters was not addressed by the trial court properly at the outset, following certification of the class. This management misstep developed into an issue raised by KMA

18. Because Bassett and the class did not offer testimony regarding common damages during the class certification proceedings, any references to expert testimony on this topic in KMA's appellate brief (*see* KMA's Brief at 23) necessarily address the expert's testimony at trial, which, as discussed *supra*, is irrelevant to prove an abuse of discretion in pre-trial class certification.

regarding the molding of the verdict, which will be discussed further *infra.*

But, we do not view the trial court's failure to devise a proper damages management plan during class certification proceedings—a failure that itself invited a distinct objection—as sufficient to render an abuse of discretion its determination that "potential differences in individual damage claims based upon individual experiences and costs associated with attempts to repair the vehicle" do not "pose any serious management difficulty." Tr. Ct. Op., 9/21/04, at 18. The question is rather whether the individual damages issues were especially difficult and burdensome on the trial court so as to factor against class certification. *See* Pa.R.C.P. No. 1708(a): *accord Smilow,* 323 F.3d at 40 n. 8 (citing 5 J.W. Moore, Moore's Federal Practice, § 23.46[.2][b], at 23–209 & n. 17) (3d ed.1997 & Supp.2002). KMA argued at the certification proceedings that the class should not be certified because individual claims proceedings on the issues of causation, manifestation, and damages would require the trial court "to preside over thousands of mini hearings, which would take years," and the class was therefore unmanageable. KMA's Supp. Memo. of Law in Opposition to Class Certification, 7/8/04, at 11. On appeal to this Court, KMA states that "the necessity for 9,401 [sic] individual post-verdict class proceedings in and of itself would have over-whelmingly established that class certification was improper in the first instance." KMA's Brief, at 30.

Setting aside KMA's failure to develop the claim in any meaningful fashion in its brief so as to allow for appellate review—a sufficient basis in itself to reject the argument, *Commonwealth v. Walter,* 600 Pa. 392, 966 A.2d 560, 566 (2009)—KMA's claim also fails on the merits. First, contrary to KMA's arguments, only the issue of individual damages would have been subject to individualized proceedings. *See also Teamsters,* 431 U.S. at 361–62, 97 S.Ct. 1843 (question of individual relief does not arise until defendant's liability has been proved and "force of that proof does not dissipate at the remedial stage of the trial"). Second, "[w]here damages is-

sues are likely to require more individualized treatment, a judge has available a number of creative methods of managing questions of remedy in a manner that protects the defendant's rights while redressing harms to individual plaintiffs." *Salvas v. Wal–Mart Stores, Inc.*, 452 Mass. 337, 893 N.E.2d 1187, 1212 (2008) (citing 2 A. Conte & H.B. Newberg, Class Actions § 4.32, at 287–88 (4th ed.2002) ("Newberg") (listing class action management techniques)). Among these are bifurcated trials for liability and damages and the use of special masters. *Id.* We are not persuaded that it is appropriate to adopt what amounts to a *per se* rule that the prospect of individualized variations in damages alone required ruling against certification. On the issue of damages, for purposes of certification, there is no compelling reason to believe that the damages could not have been calculated based on information received from class members regarding their individual experiences with their Sephias, *e.g.,* at further class proceedings or by a special master. KMA does not offer any persuasive argument that management of the damages issue alone in this fashion, for the less than 10,000 class members, would be so unduly burdensome as to prevent class certification.

## B. Typicality

Concerning typicality, Pa.R.C.P. No. 1702(3), KMA claims that Bassett's experience was "vastly different" from that of the other class members and required different treatment from other class members at trial. According to KMA, "unrebutted" evidence established that the Sephia's front brake system underwent continuous redesign between 1997 and 2000, that Bassett's vehicle was only one of "over thirteen" designs, and, as a result, that her experience was unrepresentative of the class. KMA emphasizes that the model of Bassett's car, her repair history, and interaction with KMA were unique to her so that any claim of typicality should have been fruitless.

KMA argues that, as with the commonality and predominance prongs, the trial court considered evidence irrelevant to an express warranty claim like Bassett's, which evidence

would have supported "at best" an uncertifiable Lemon Law violation. But, KMA states, Bassett failed to pursue her Lemon Law claim and her individual experience and individual proof were not probative of class-wide claims of express warranty. According to KMA, the class in this case lacked a representative whose experience was typical and should not have been certified.

Bassett responds that typicality was established. According to Bassett, her position on common issues of law and fact is sufficiently aligned with that of absent class members so that pursuit of her own interests would also advance those of the class. Bassett reiterates that she purchased a model year 2000 Sephia with the same warranty and same front brake defect as the absent class members. She states that the brake components were interchangeable between 1997–2000 Sephias and that she was "ideally suited" to present the class claims regarding the ineffectiveness of the design changes, because her vehicle was the latest model in the class. Bassett emphasizes that proof of her claims necessarily proved each class member's claims as well.[19]

 Rule 1702(3) states that "[o]ne or more members of a class may sue ... as representative parties on behalf of all members in a class action only if[, *inter alia*,] the claims ... of the representative parties are typical of the claims or defenses of the class." Pa.R.C.P. No. 1702(3). A challenge to the typicality requirement presumes that commonality has been established. The purpose of the typicality requirement is to ensure that "the class representative's overall position on the common issues is sufficiently aligned with that of the absent class members to ensure that her pursuit of her own interests will advance those of the proposed class members." *D'Amelio*, 500 A.2d at 1146; *Baldassari*, 808 A.2d at 193.

---

**19.** Bassett also asserts that KMA admitted that Bassett's claims are typical of the class by not challenging the class verdict with respect to the implied warranty claims. But, Bassett cites no legal authority—for there is none—in support of this position. *See Basile,* 973 A.2d at 421–22 ("party adversely affected by earlier rulings in a case is not required to file a protective cross-appeal if that same party ultimately wins a judgment in its favor") (emphasis omitted).

Typicality exists if the class representative's claims arise out of the same course of conduct and involve the same legal theories as those of other members of the putative class. *Dunn v. Allegheny County Prop. Assessment Appeals & Review,* 794 A.2d 416, 425 (Pa.Cmwlth.2002). The requirement ensures that the legal theories of the representative and the class do not conflict, and that the interests of the absentee class members will be fairly represented. *See id.; Georgine v. Amchem Prods., Inc.,* 83 F.3d 610, 632 (3d Cir.1996). But, typicality does not require that the claims of the representative and the class be identical, and the requirement "may be met despite the existence of factual distinctions between the claims of the named plaintiff and the claims of the proposed class." *Keppley v. Sch. Dist. of Twin Valley,* 866 A.2d 1165, 1174 (Pa.Cmwlth.2005); *Hassine v. Jeffes,* 846 F.2d 169, 176–77 (3d Cir.1988); *Klusman v. Bucks County Court of Common Pleas,* 128 Pa.Cmwlth. 616, 564 A.2d 526, 531 (Pa.Cmwlth. 1989). *aff'd per curiam,* 524 Pa. 593, 574 A.2d 604 (1990) (atypicality "must be clear and must be such that the interests of the class are placed in significant jeopardy").

Here, the trial court did not abuse its discretion in deciding that Bassett was a typical class member. Bassett and the class asserted the same claims for breach of express warranty, premised on similar facts and KMA conduct. During class certification proceedings, Bassett adduced evidence to support her averments that, like the other class members, she purchased a Sephia vehicle model year 1997–2000 and received the standard purchase contract and written warranty. Because of a design defect that affected the ability of the Sephias' front braking system to dissipate heat, Bassett's vehicle, like the other vehicles in the class, experienced premature wear of the brake pads and warping of the rotors. As with the other members of the class, KMA failed to effectively repair Bassett's vehicle free of charge in accordance with the written express warranty. Bassett's Complaint, at ¶¶ 15–21; N.T., 7/15/04, at 84–89, 99–106.

During certification proceedings, KMA emphasized testimony that not all 1997–2000 Sephias utilized the same brake pads

or rotors because the brake system was constantly redesigned and Bassett's vehicle had one of thirteen designs available on 1997–2000 Sephias. N.T., 7/16/04, Vol. 1, at 8–23. Bassett's expert acknowledged the design changes, but testified that these changes were minor and that they did not eliminate the design defect which affected all Sephias in the class, including Bassett's vehicle. N.T., 7/15/04, at 102, 105. KMA also suggested that driver habits or environmental conditions were likely to cause premature brake wear and that, therefore, Bassett's experience could only be atypical of the class and insufficient to prove the brake defect allegations of the class. N.T., 7/15/04, at 120–23, 148. But, Bassett rebutted the suggestion by referring to KMA internal documents and her own expert's testimony, which traced the cause of premature wear of the Sephias' brakes to a design defect rather than to other factors. N.T., 7/16/04, Vol. 1, at 52–53 (referring to McCurdy documents). Bassett's expert also testified that wear rates on the 1997–2000 Sephias were abnormal even when accounting for factors such as driver habits and environmental conditions highlighted by KMA. N.T., 7/15/04, at 131. On this disputed evidence, the trial court was persuaded that Bassett's experience was typical of the class.

KMA's central position that the trial court's decision on this point "was contrary to the evidence," *see* KMA's Brief at 25, n. 13, is not borne out by the record. Rather, as we have detailed, the evidence was disputed, creating an issue for the trial court to resolve. Where, as here, the evidentiary record supports the trial court's credibility determinations, we are bound to accept them. *See In re R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (2010). The existence of facts in the record that would support a result contrary to that reached by the certifying court does not demonstrate an abuse of discretion by that court. *See In re E.F.*, 995 A.2d at 329.

## C. Adequacy of Representation

Finally, KMA states that it is also challenging the adequacy of Bassett's representation of the class. Pa.R.C.P. No. 1702(4). Rule 1702(4) states that a representative party may

sue on behalf of a class if, *inter alia,* the representative party "will fairly and adequately assert and protect the interests of the class under the criteria set forth in Rule 1709." *Id.* Rule 1709 states that fairness and adequacy of representation is an inquiry into the adequacy of class counsel, into any conflict of interest that Bassett, as the representative party, may have in the maintenance of the class action, and into the financial resources secured by Bassett and intended "to assure that the interests of the class will not be harmed." Pa.R.C.P. No. 1709; *Klusman,* 564 A.2d at 531.

■ Here, KMA develops its adequacy of representation argument only as a subset of and in reference to whether Bassett's interests are typical or aligned with those of the class, and fails to develop any arguments that address the Rule 1709 criteria. *See* KMA's Brief at 25. This argument thus sounds more as a challenge to typicality rather than to the adequacy of representation prerequisite for certification. Therefore, any claim of trial court error or abuse of discretion regarding the adequacy of representation prerequisite is waived for failure to develop "in any meaningful fashion capable of review." *Commonwealth v. Walter,* 600 Pa. 392, 966 A.2d 560, 566 (2009); *see Purple Orchid, Inc. v. Pa. State Police,* 572 Pa. 171, 813 A.2d 801, 804 (2002) (issue waived by failure to address and develop in appellate brief).

### D. Conclusion

For the foregoing reasons, we conclude that the trial court did not abuse its discretion in certifying the class. *Kelly,* 546 A.2d at 610. The case properly proceeded to trial as a class action.

### II. *Sufficiency and Weight of Evidence*

Intermingled with its issues of class certification, KMA raises questions of whether the evidence was sufficient to support the jury's finding of liability for breach of express warranty, and of whether the jury's verdict was against the weight of the evidence. KMA asks that we reverse the

Superior Court's decision and vacate the judgment in favor of the class.

KMA maintains that Bassett's proof in support of her own claim against KMA was not probative of the other class members' claims and the trial court erroneously allowed the jury to extrapolate from evidence of Bassett's claim proof respecting the entire class. KMA again rests its argument on the premise that Bassett did not establish the commonality, typicality, adequacy of representation, and predominance prerequisites for class certification. According to KMA, the class also failed to prove all the elements of a breach of the express warranty claim and the Superior Court "improperly used [evidence of] the [jury-]rejected implied warranty claims to justify a class-wide breach of express warranty cause of action." KMA's Brief at 28.

Bassett responds that, at trial, she introduced class-wide common evidence which established that KMA breached its express warranty. According to Bassett, KMA did not object to the admission of the "common" evidence at trial and failed to argue against her offer of generalized proof. Bassett argues that, irrespective of KMA's argument on appeal, the jury credited her evidence and found KMA liable to the entire class. Bassett also recounts the evidence introduced at trial, specifically addressing the following elements of a breach of warranty: KMA's warranty or promise, KMA's failure to meet its promise, causation, notice to KMA and opportunity to cure, and the class members' damages. Although Bassett articulates her arguments with parallel references to the record from the trial and to the record created during class certification proceedings, she observes that there is "a material difference between pre-trial certification and post-trial reexamination" of a trial and argues that "the question after trial is whether generalized proof was fairly presented and confronted by the parties at trial." Bassett's Brief at 33.

In its Rule 1925(a) opinion, the trial court described the evidence introduced at trial and decided that it was sufficient to support the jury's verdict on Bassett's breach of express warranty claim. The court recounted that the of-record depo-

sition of Tim McCurdy, KMA's Director of Technical Operations, and the testimony of Donald Pearce, KMA's Vice President of Parts and Service, and Bassett's expert indicated that all 1997–2000 Sephias had similarly designed brake systems with interchangeable components and all were equally affected by a systemic design problem. The court also noted internal documents which demonstrated that KMA was aware of the brake system problems as early as 1995 and tried unsuccessfully to convince parent-company KMC to remedy the problem. One document prepared for KMA vendors, for example, related the discrepancy between the high warranty claims rate for the Sephia (41.8%) versus the relatively low rate for KMA's Sportage (6.3%) during the 1997–1999 period. In addition, a field report from a Kia Parts Service Manager in May 1999 described the Sephias' defect as "a well[-]known condition [that] needs to be corrected ASAP," and a record of calls to KMA's technical assistance hotline documented complaints that "systemic design problems existed causing unreasonably early wear-out of brakes and rotors." The court also described evidence of KMA attempting to identify the brake problem with the aid of an independent engineering firm, and to remedy the defect by developing and introducing improved pads and rotors from different manufacturers. But, testing of the Sephias after KMC's brake pad and rotor improvements showed that the vehicles' brake system components continued to underperform. Subsequently, KMA offered a "Brake Coupon Program" to provide unconditional free repairs to Sephia owners who had had three or more brake repairs. Tr. Ct. Op., 12/29/06, at 10–22.

Finally, the court described KMA's sale of 1997–2000 Sephias to consumers with identical written warranties, which provided that KMA promised the "new Kia Vehicle [to be] free from defects in material and workmanship." KMA's warranty manual also included a maintenance schedule which recommended a first inspection of the brake system at 30,000 miles or 30 months for ordinary driving use, or 15,000 miles or 15 months for instances of severe driving conditions. Witnesses testified that, under ordinary use conditions, the Sephias did

not meet consumer expectations for brake component life under either KMA or American consumer standards. The American consumer expectation was of a 20,000 miles effective life for brake pads but the Sephias were severely underperforming at 3,000 miles on the earlier models and 9,400 for later models. According to the trial court, evidence showed that KMA paid for some repairs and covered others as part of its coupon program. Tr. Ct. Op., 12/29/06, at 22–32. In the trial court's view, the evidence was sufficient to support the liability judgment in favor of the class; additionally, "the verdict was fully supported by the weight of the evidence." *Id.* at 39. The Superior Court affirmed on the basis of the trial court's opinion. Super. Ct. Op., 10/24/07, at 2.

Initially, we agree with Bassett that our examination of the trial court's pre-trial certification decision is materially different from our examination of issues raised post-trial following the judgment in favor of the class, including issues of evidentiary sufficiency and weight. *Accord Behrend,* 655 F.3d at 194–95 (court determined relevant geographic market solely for purposes of class certification and not binding on merits). The action proceeded at trial on behalf of the entire class. The class action mechanism is designed to permit a named individual to proceed to trial on behalf of the class, including herself, and to try all of the class members' claims together to judgment. *See Bell, supra;* Pa.R.C.P. No. 1715(c) ("judgment entered in an action certified as a class action shall be binding on all members of the class except as otherwise directed by the court"). *Accord* Joel H. Bernstein & Ronna Kublanow, *Securities Arbitration 1993: Products, Procedures, and Causes of Action,* 819 PLI/Corp 689, 703–05 (1993) (comparing discovery and trial procedure in class action versus multi-plaintiff proceedings). The record reflects that, at trial, the parties proceeded on the premise that Bassett was introducing evidence in support of all the class members' claims. Indeed, at no time did KMA file a motion to decertify the class pursuant to Rule 1710. Pa.R.C.P. No. 1710(d) (order certifying class may be revoked, altered, or amended "before a decision on the merits").

Once the jury rendered its decision, the trial court's certification of the class was no longer revocable. *Id.* The only available avenue for KMA to obtain relief from the judgment based on post-verdict arguments that evidence personal to Bassett was not probative of the class claims was to challenge the sufficiency or weight of the evidence. And, indeed, KMA essentially appears to be challenging the sufficiency and weight of the evidence, even if its claims are not so precisely articulated.[20] We address each claim.

## A. Sufficiency of the Evidence

▮▮▮▮▮ When reviewing a sufficiency of the evidence claim in a civil case (here, a breach of express warranty action), an appellate court, viewing all the evidence and reasonable inferences therefrom in the light most favorable to the verdict winner, must determine whether the evidence was sufficient to enable the factfinder to find that all the elements of the causes of action were established by a preponderance of the evidence. *Elliott–Lewis Corp. v. York–Shipley, Inc.*, 372 Pa. 346, 94 A.2d 47, 50 (1953); *Mescanti v. Mescanti*, 956 A.2d 1017, 1020 (Pa.Super.2008). *See McElwee v. Southeastern Pa. Transp. Auth.*, 596 Pa. 654, 948 A.2d 762, 774 (2008); *Commonwealth v. Hawkins*, 549 Pa. 352, 701 A.2d 492, 499 (1997). Whether a claim was established under a preponderance of the evidence standard is "tantamount to a 'more likely than not' inquiry." *Popowsky*, 937 A.2d at 1055 n. 18; *Commonwealth v. D'Amato*, 579 Pa. 490, 856 A.2d 806, 818–19 (2004).

▮▮▮ To prevail on her breach of express warranty claim in this class action, Bassett had to establish that KMA breached or failed to meet its warranty promise with respect to the members of the class, that the breach was the proximate cause of the harm to the class members, and the amount of the ensuing damages. *Price v. Chevrolet Motor Div.*, 765 A.2d

20. The record shows that KMA raised sufficiency and weight of the evidence issues in both its post-trial motion and in its Rule 1925(b) statement. *See* KMA's Supplemental Motion for Post–Trial Relief, 7/15/05, at ¶¶ 5; 2–3; KMA's Concise Statement of Matters Complained of on Appeal, 12/28/05, at ¶ 2.

800, 809 (Pa.Super.2000).[21] Additionally, because the class members had already accepted tender, Bassett had to show that the class notified KMA of the breach within a reasonable time. 13 Pa.C.S. § 2607(c)(1).

 KMA's warranty, provided to all the members of the class, states that:

[KMA] warrants that [the] new Kia Vehicle is free from defects in material or workmanship, subject to the following terms and conditions. An Authorized Kia Dealer will make the necessary repairs, using new or remanufactured parts, to correct any problem covered by this limited warranty without charge to you.

\* \* \*

The liability of [KMA] under this warranty is limited solely to the repair or replacement of parts defective in Kia-supplied material or workmanship by an Authorized Kia Dealer at its place of business . . . .

*E.g.,* KMA's 1999 Warranty and Consumer Information Manual at 4, 6; N.T., 5/24/05, Vol. 1, at 67 (warranty manual same for 1997–2000 Sephias).[22]

21. As discussed *supra,* a plaintiff in a breach of warranty claim is required to prove "reliance" only if there is a disputed issue regarding whether the promise allegedly breached was part of the basis of the bargain or a term of the contract. *See, e.g., Goodman,* 849 A.2d at 1246. Here, there is no question that KMA's written express warranty was a part of the standard sale contract that all class members received and, therefore, an inquiry into whether each class member relied on KMA's promise to deliver a defect-free vehicle and to repair or replace items covered by the warranty is unnecessary. *See* 13 Pa.C.S. § 2313(a)(1); *Simeone,* 581 A.2d at 165.

22. In its "Statement of the case," KMA states that its liability was limited to the repair or replacement of defective parts and characterizes claims of the class members as claims for breach of express warranty "by refusing to replace parts during the warranty period." KMA's Brief at 6. In response, Bassett disputes at length KMA's description of the warranty and of the class claims, asserting that KMA's warranty was not merely a "repair or replace warranty" but a "classic warranty." Bassett's Brief at 14–21 (citing *Nationwide Ins. Co. v. Gen. Motors Corp.,* 533 Pa. 423, 625 A.2d 1172 (1993)). In *Nationwide,* the Court addressed the distinction between a "repair or replace" and a "classic" warranty in deciding when the applicable statute of limitations for a breach of warranty claim began to run. This issue is not before us and

At trial, the record shows that Bassett offered evidence (in the form of expert testimony from R. Scott King, testimony from KMA executives and other corporate designees, Tim McCurdy, Lee Sawyer, Donald Pearce, and Y.S. Sohn,[23] and internal KMA memoranda) that the 1997–2000 Sephias were manufactured and sold with defective front brake systems. The brake systems were defective because the rotors' placement on the vehicles—or the design of the brake system—did not permit sufficient dispersal of heat generated during normal operation of the brakes, which caused premature wear of the brake pads and warping of the rotors. Once the lining on the brake pads wore down to the indicators and the rotors warped, the members of the class experienced noise and vibration when applying the brakes. KMA's corporate designee Tim McCurdy and Bassett's expert agreed that brake system components had to be replaced significantly in advance of when anticipated by KMA and by consumers. It was only in 2001, when a significant modification for that year's model involving a re-design of the front brake rotor, a larger brake pad, and a repositioning of the axle, that the performance of the brake system improved to KMA and American market expectations. According to Bassett's expert, high warranty claim rates for the 1997–2000 Sephias confirmed the existence of a common defect. *See* N.T., 5/19/05, Vol. 1, at 55, 60, 68–70,

the distinction between the two types of warranties is irrelevant. Rather, pursuant to well-established contract interpretation principles, we look to the plain language of the warranty, which is clear and unambiguous, to identify KMA's promise and any breach of that promise. *See Greer v. City of Philadelphia*, 568 Pa. 244, 795 A.2d 376, 380 (2002).

23. McCurdy was KMA's Director of Technical Operations, in charge of managing technical concerns and investigations, communicating with field technicians and dealers, and reporting to KMC. Sawyer was KMA's Senior Vice–President of Fixed Operations, responsible for all aspects of parts and service, such as consumer affairs, warranty coverage, quality assurance, and service training. Pearce was KMA's Vice–President of Service, and was responsible for product quality and technical operation support for the field and retail organizations, warranty claim administration, and training activities. Finally, Sohn was KMC's Manager of Chassis Division from 1996 to 2001, when he was promoted to deputy general manager at KMC. In his role as Manager of the Chassis Division, Sohn was responsible for vehicle parts design, review of parts testing, and design enhancements (including for brakes).

95–116 (King testimony); N.T., 5/18/05, Vol. 1, at 80–81; 5/18/05, Vol. 2, at 15–16; 34–35, 41–42, 72–78 (McCurdy deposition); N.T., 5/23/05, Vol. 1, at 17, 20 (Sawyer deposition); N.T., 5/23/05, Vol. 1, at 42–43 (Pearce deposition); N.T., 5/23/05, Vol. 5. at 19–23 (Sohn deposition); Tim McCurdy Inter–Office Memorandum to James Lee, 2/03/99.

Further, KMA did not make effective necessary repairs free of charge. KMA's warranty data, internal KMA documents, and King's testimony regarding the nature of the brake system defect allowed the jury to conclude that simply replacing the pads and rotors on the 1997–2000 model year Sephias was an ineffective repair, which did not resolve the defective design problem that affected the vehicles. Indeed, only a "field fix" for vehicles already on the market, announced via a January 2002 Technical Service Bulletin, and a redesign of the brake system for new models (re-named the Spectra), successfully offered the necessary repair in late 2001. *See* KMA Technical Service Bulletin (chassis division), 1/02, Vol. 3 # 8. Testimony from KMA's corporate designees Donald Pearce and Michelle Cameron [24] also established that Sephia owners were responsible to pay for repairs out of pocket following the premature wear of brake system components, because brake pads and rotors were generally not covered under the warranty. N.T., 5/23/05, Vol. 1, at 30–33, 42–43, 54–55, 58–62 (Pearce deposition); N.T., 5/24/05, Vol. 1, at 39 (Cameron cross-examination), 64–77 (Pearce cross-examination).

Both Bassett's expert and KMA executives attributed consumer complaints of noise, vibration, and early brake component wear to the brake system design. Bassett's expert testified that none of the materials that he reviewed from KMA suggested that the widespread problem with the brakes on the Sephias was caused by individual driver habits such as "a heavy foot on the brake," or road conditions, dirt, and dust. *See* N.T., 5/18/05, Vol. 2, at 41–43 (McCurdy deposition); N.T.,

24. Cameron was a regional, and then national, Manager of KMA's Consumer Affairs Department. She was responsible for developing and implementing policies and procedures for handling customer complaints.

5/19/05, Vol. 1, at 107–10 (King testimony); N.T., 5/20/05, Vol. 1, at 46–52 (King re-direct), N.T., 5/23/05, Vol. 1, at 42–43 (Pearce deposition).

The record also contained evidence that, at least since late 1998 (more than two years before the class action was filed), KMA had notice that the brake system on the Sephias, beginning with the 1997 model, was performing under market expectations in terms of wear and required frequent repair and replacement. According to KMA executives, they became aware of the problem because of an increase in the sale of brake parts and warranty claim activity. KMA sought repeatedly to increase the performance of the brake system but failed until 2001, when a field fix was developed for in-use models concurrently with the re-design of front brake system on the new model in the Sephia line. In the meantime, class members experienced varying treatment in seeking replacement of brake pads and rotors under the warranty. *See* Tim McCurdy Inter–Office Memorandum to James Lee, 2/03/99; KMC Brake Quality Team Meeting Summary, 2/15/99; N.T., 5/23/05, Vol. 1, at 16–18, 23–24 (Sawyer deposition); N.T., 5/18/05, Vol. 2, at 35 (McCurdy deposition). Finally, Bassett adduced sufficient evidence to prove that the members of the class suffered damages. Donald Pearce and Michelle Cameron testified that KMA dealerships offered some free repairs to promote good will for Sephia owners, as well as the brake coupon program in late 2001. But, according to the KMA witnesses, in general, the replacement of brake pads and rotors was not covered by the written warranty. As a result, KMA owners sustained out-of-pocket repair costs estimated by Bassett's expert at approximately $1,005 over the life of their Kia Sephia. On cross-examination, the expert stated that he derived the number not from Bassett's repair history data but by relying on data from KMA, and in particular on the Field Assurance and the Technical Assistance Center Incident reports, regarding the frequency of repairs over the life time of a Sephia. N.T., 5/19/05, Vol. 3, at 19–26 (King testimony); N.T., 5/20/05, Vol. 1, at 23 (King cross-examination); N.T., 5/23/05, Vol. 1, at 23–24 (Sawyer deposition); N.T.,

5/23/05, Vol. 5, at 103; N.T., 5/24/05, Vol. 1, at 39 (Cameron cross-examination), 64–77 (Pearce cross-examination).[25]

KMA's primary defense strategy at trial was to undermine the class assertions that the Sephia brake system was defective and that any defect affected all the members of the class, by referencing the design changes and the fact that it is common to hear complaints regarding noise, vibration, and brake component wear. KMA executive Y.S. Sohn explained that the primary goal of designing brakes was safety and that brake component longevity was simply an issue of merchantability or competitiveness in the automobile market. According to Sohn, there was no stated or established target for brake pad longevity by which to measure a premature wear defect. N.T., 5/24/05, Vol. 6, at 17–34, 45–48 (Bowman testimony); N.T., 5/25/05, Vol. 2, at 10–29 (Sohn deposition).

KMA elicited testimony from Bassett's expert which confirmed that the rotors on Bassett's vehicle did not present a safety concern. The expert also agreed that other vehicle or driver-specific causes were possible for the symptoms exhibited by vehicles in the class; but, on re-direct, he concluded that KMA internal memoranda and warranty data persuaded him that they were not the proximate cause of the premature wear of brake system components experienced by the class members. Finally, although KMA asked the expert about whether he based his calculation of out-of-pocket repair costs for the class on Bassett's experience and challenged the expert's qualifications in providing an opinion on damages, KMA did not object to the introduction of aggregate damages evidence on due process or other grounds, and did not introduce any evidence to rebut the class expert's damages testimony. N.T., 5/16/05, Vol. 1, at 44–50 (motions); N.T., 5/19/05, Vol. 3, at 49,

25. KMA alleges that Bassett's expert's testimony was not probative of the damages of each class member because it did "not reflect the proper measure of damages for breach of an express warranty, but, at best, addresses the measure of damages in an implied warranty claim," which the jury rejected. KMA's Brief at 23. But, KMA does not develop any law to support this argument and the Pennsylvania Commercial Code draws no distinction between damages for breach of express versus implied warranty. *See* 13 Pa.C.S. § 2714. KMA's claim, therefore, fails as stated.

52–61 (King cross-examination); N.T., 5/20/05, Vol. 1, at 5–9, 23 (King cross-examination), 46–51 (King re-direct).

 On appeal, KMA no longer presses the "no defect" theory it pursued at trial, and challenges instead whether sufficient evidence was introduced at trial to prove all the elements of a breach of warranty claim with respect to all the class members on the basis that the evidence described only Bassett's individual experience. Essentially, KMA questions whether Bassett established a breach of express warranty with respect to the entire class. *See McElwee,* 948 A.2d at 773.

Contrary to KMA's claims, the evidence of record was sufficient to establish all the elements of a breach of warranty claim by a preponderance of the evidence. *See Mescanti,* 956 A.2d at 1020. The evidence established that KMA made the same promise to all class members, 1997–2000 Sephia owners, to deliver a vehicle free of manufacturing defects and to correct free of cost any problem covered by the warranty. All vehicles in the class were sold with a defectively designed brake system causing premature wear of brake components that necessitated frequent replacement. KMA knew that the 1997–2000 Sephias were not performing up to the expectations of KMA and the American market, and that the transactions were troublesome well before this lawsuit was filed. Although KMA sometimes covered the repairs under the warranty or offered free repairs under other consumer satisfaction programs, members of the class also paid for repairs out-of-pocket. Testimony supported a verdict of up to $1,005 per class member for out-of-pocket costs over the life of a Kia Sephia. This evidence was sufficient to establish the breach of warranty claim with respect to the entire class. *Price,* 765 A.2d at 809. The trial court did not commit an error of law in sustaining the verdict and rejecting KMA's application for a judgment notwithstanding the verdict or for a new trial.

## B. Weight of the Evidence

 Next, KMA essentially contends that the jury's verdict in favor of the class was against the weight of the

evidence because the record contained "nothing more than anecdotal testimony regarding [Bassett]'s *personal* experience, expert testimony regarding alleged 'defects' generally present in class vehicles and irrelevant KMA statistics...." KMA's Brief at 18 (emphasis in original, footnote omitted). KMA insists that the individual experiences and circumstances of the class members differed and were unsuitable for class-wide treatment, citing selected evidence. Moreover, KMA states the "only" class-wide evidence was "that KMA actually had performed under the warranty," and this proves that the class failed to establish a breach of express warranty. *Id.* at 27 (emphasis omitted).[26] The class responds that Bassett introduced evidence on behalf of herself and the class regarding all the necessary proof for a breach of express warranty.

 Allegations that a motion for judgment notwithstanding the verdict or a new trial should have been granted because the verdict was against the weight of the evidence are addressed to the discretion of the trial court. *Commonwealth v. Cousar*, 593 Pa. 204, 928 A.2d 1025, 1035–36 (2007). "An appellate court, therefore, reviews the exercise of discretion, not the underlying question whether the verdict is against the weight of the evidence. The factfinder is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses." *Id.* The trial court awards a judgment notwithstanding the verdict or a new trial "only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice. In determining whether this standard has been met, appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion." *Id.* at 1036. Thus, the trial court's decision based on a weight of the evidence claim is among "the least assailable of its rulings." *Id.*

**26.** In its post-trial motion and Rule 1925(b) statement, KMA acknowledged that similar arguments went to the weight of the evidence. KMA's Supplemental Motion for Post–Trial Relief, 7/15/05, at ¶¶ 5; 2–3; KMA's Concise Statement of Matters Complained of on Appeal, 12/28/05, at ¶ 2.

After examining the evidence in this case, we find meritless KMA's assertion that the jury improperly extrapolated to the class evidence personal to Bassett, and that this process resulted in a verdict that shocks one's sense of justice. Bassett, as the representative of the class, introduced evidence that addressed and tended to prove KMA's liability to each of the class members. KMA's assertion to the contrary is based on selected witness testimony and rests on claims of erroneous credibility determinations.

Witness credibility is an issue "solely for the jury to determine." *Commonwealth v. Hawkins*, 549 Pa. 352, 701 A.2d 492, 501 (1997). The jury in this case had an opportunity to hear conflicting evidence regarding the existence of a common brake system design defect affecting the 1997–2000 model Sephias, of KMA's knowledge of the defect, of KMA's unsuccessful efforts to repair the defect, and of its policy to consider brake component repairs non-warranty items, only sometimes covering replacements and, consequently, causing Sephia owners out-of-pocket costs. Bassett presented evidence in support of claims for the entire class. *Cf. Behrend*, 655 F.3d at 203–04 (court's inquiry is whether class claims may be proven on class-wide basis using common proof). Based on this evidence, the jury found in favor of Bassett and the class on the breach of express warranty claim and awarded damages. We see no abuse of discretion in the trial court concluding that the verdict is not so contrary to the evidence as to shock one's sense of justice.

■ Whether the amount of damages awarded to each class member is against the weight of the evidence is a narrower and potentially more difficult question. Bassett's expert testified that each class member incurred identical costs of approximately $1,005. He calculated these costs based on: (1) a life expectancy for each Kia of 100,000 miles, (2) during which time, brake system components would be replaced approximately every 10,000 miles, half the distance that would have met KMA and industry standards; (3) at the average cost of replacing brake components in Pennsylvania ($175 for replacing brake pads and resurfacing rotors, and

$240 for replacing brake pads and replacing rotors). Bassett's expert estimated that each vehicle underwent five extra repairs in addition to wear-and-tear replacements of brake pads and rotors. This calculation, of course, does not account for factors such as: whether class members owned their vehicles for 100,000 miles, whether each class member experienced exactly five additional repairs, and whether any additional repairs were covered under the warranty. Indeed, warranty data introduced at trial reflected that KMA covered some of the brake component replacements under good will and brake coupon programs, which suggested that a number of the estimated repairs for the class did not in fact cause class members out-of-pocket expenses.

As Mr. Justice Saylor explains in his dissent, the class never attempted to account for variables in damages resulting from "markedly different experiences of personal expenditure to address Sephia brake problems." Dissenting Op., at 468, 469–72 & n. 7, 34 A.3d at 59, 60–61 & n. 7. The class expert testified to aggregate damages representing out-of-pocket costs that likely did not reflect the actual expenses of each or even most members of the class. As Justice Saylor points out, this evidentiary approach "blur[s] the substantive requirements of the law of damages." *Id.* at 476, 34 A.3d at 64. The dissent emphasizes that court sanctioning of agreements to calculate damages in the aggregate as part of class action settlements involves different considerations from court approval of aggregate damages evidence proffered in the adversarial trial setting. *See id.* at 475 n. 14, 34 A.3d at 63–64 n. 14 (citing *City of Detroit v. Grinnell Corp.*, 356 F.Supp. 1380, 1385 (S.D.N.Y.1972)). As Justice Saylor notes, the parties' consensual acceptance of rough justice does not distort the expectations, predictability, and fundamental fairness of our judicial system. *See id.* at 475, 34 A.3d at 64.

On the other hand, we note that some jurisdictions have permitted the use of aggregate damages calculations in class actions. *See, e.g., Scottsdale Mem'l Health Sys., Inc. v. Maricopa County*, 224 Ariz. 125, 228 P.3d 117, 133 (App.2010) (rejecting claim that calculating damages based on statistical sampling is *per se* violation of due process); *In re Pharm.*

*Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 197–99 (1st Cir.2009) *("In re Pharm.")* (rejecting due process challenge to aggregate damages and to expert's method of calculating those damages); *Hilao v. Estate of Marcos*, 103 F.3d 767, 784–86 (9th Cir.1996) (rejecting due process challenge to aggregate damages calculation based on sample claims); *but see, e.g., McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 231–33 (2d Cir.2008) (aggregate recovery for class followed by individualized distribution violates due process); *In re Fibreboard Corp.*, 893 F.2d 706, 711–12 (5th Cir.1990) (aggregate damages extrapolated from damages of sample plaintiffs violated Texas law requiring proof of causation and damages). In *In re Pharm.*, the U.S. Court of Appeals for the First Circuit concluded that: "Aggregate computation of class monetary relief is lawful and proper. Courts have not required absolute precision as to damages." 582 F.3d at 197 (quoting 3 Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 10.5, at 483–86 (4th ed.2002) ("Newberg")). *Accord Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 124, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969) (citing *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 564, 51 S.Ct. 248, 75 L.Ed. 544 (1931)) ("[a]lthough the factfinder is not entitled to base a judgment on speculation or guesswork, the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly"). With specific respect to a due process challenge to such a computational model, the First Circuit stated: "Challenges that such aggregate proof affects substantive law and otherwise violates the defendant's due process or jury trial rights to contest each member's claim individually, will not withstand analysis.... Just as an adverse decision against the class in the defendant's favor will be binding against the entire class in the aggregate without any rights of individual class members to litigate the common issues individually, so, too, an aggregate monetary liability award for the class will be binding on the defendant without offending due process." *In re Pharm.*, 582 F.3d at 197–98 (quoting *Newberg, supra* ). Furthermore, as Justice Saylor notes, "some jurisdictions have accepted the use of statistical, surveying, and sampling techniques" in class

actions to prove damages in the aggregate, while others have rejected the approach. *See* Dissenting Op. at 472 n. 10, 34 A.3d at 62 n. 10 (citing Laurens Walker, *A Model Plan to Resolve Federal Class Action Cases by Jury Trial*, 88 Va. L.Rev. 405, 415–20 (2002); 2 McLaughlin on Class Actions § 8:7 (6th ed.2010)).

The question of whether testimony regarding aggregate damages is probative to calculate the amount of damages in a class action would be an issue of first impression for this Court. In this instance, Bassett's expert offered such testimony. Once the evidence was offered, KMA had the opportunity to object that it was incompetent to the task or violated KMA's right to due process (or other rights), to cross-examine the witness on the weakness of his methodology, or rebut the argument with evidence of its own; yet, the testimony of Bassett's expert went unchallenged in these respects.

Instead, as we read the record and KMA's brief, KMA proceeded both at trial and on appeal on the theory that Bassett introduced only evidence of her own damages and no evidence of damages to any other member of the class. But, this position misapprehends the record. As described, Bassett's expert specifically testified to his calculation of estimated damages for each member of the class, which in the aggregate produced the molded verdict.

Justice Saylor has well demonstrated that this testimony was subject to a colorable objection on the ground that it inaccurately or imprecisely captured the amount of damages for individual members of the class. But, at the appropriate time at trial, when any error in this regard could have been addressed or avoided, KMA did not challenge the expert's method of calculating damages in the aggregate on due process or any other grounds, and thus waived the argument. The dissent articulates a problematic issue regarding the proof and determination of individual damages differently, and certainly more cogently, than KMA did either at trial or on appeal. In light of existing jurisprudence that articulates a reasonable ground upon which to permit certain forms of aggregate damages evidence in class action litigation, and in light of the narrower nature of KMA's preserved challenge to

the damages calculation here, we find no abuse of discretion in the rejection of this aspect of KMA's weight claim.[27]

### III. Molding of the Verdict

Next, KMA claims that the Superior Court erred in affirming the trial court's judgment of a molded verdict of $5,641,200. KMA makes two related but nonetheless distinct arguments. First, KMA contends that molding of the verdict was improper or in violation of its due process rights because it allowed each member of the class to recover $600, although no evidence of liability and amount of out-of-pocket costs was of record for any member of the class except Bassett. Essentially, the manufacturer re-asserts its prior arguments regarding the certification of the class and the sufficiency of evidence to prove a breach of the express warranty. *See Jackson v. Virginia*, 443 U.S. 307, 313–14, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (constitutional predicate of sufficiency claim is due process clause). Second, KMA states that molding of the verdict was improper because the trial court did not conduct claims proceedings per its pre-trial order of May 16, 2005 ("May 16th Order"), which disposed of KMA's motion to bifurcate the trial into proceedings on what KMA perceived as "common" versus "individual" issues. The May 16th Order stated:

> AND NOW, this 16th day of May, 2005, upon consideration of the Motion to bifurcate of Defendant, Kia Motor [sic] America, Inc., it is hereby ORDERED that Defendant's Motion is DENIED. Each class member's entitlement to recover if plaintiff class prevails, shall be determined at claims proceedings.

Tr. Ct. Order, 5/16/05. According to KMA, in light of the May 16th Order, the trial court molded the verdict "without forewarning" and in violation of KMA's constitutional due process

27. We emphasize the narrow nature of our holding in this regard. Given the limited nature of KMA's preserved challenge, we need not, and therefore do not, express a definitive view on the questions of whether proving damages in the aggregate in a class action is "lawful and proper" in Pennsylvania, and of whether the methodology of Bassett's expert in estimating individual damages here was sound.

rights. Regarding its due process claim, KMA also insists that the improper certification of the class denied KMA the opportunity to present a defense as to each member of the class and have its merits fairly judged. KMA claims that the trial of the case as a class action improperly expanded the substantive rights of class members other than Bassett, who "were awarded damages for a harm they did not prove." KMA's Brief at 28–32.

Bassett and the class respond that KMA distorts the record. According to Bassett, the evidence was "crystal clear that this case was tried on a class basis and defended on a class basis." Bassett's Brief at 39. She states that the jury entered a verdict for the class and not for Bassett alone, as the jury questionnaire reflected. Question 5 on the jury questionnaire stated:

State the amount of damages if any, sustained by each [c]lass member:

\* \* \*

b) For repair expenses, reasonably incurred, as a result of defendant's breach of warranty.

Jury Verdict Special Interrogatories, 5/27/05. After the jury awarded $600 per class member, the trial court merely realized the plain intent of the jury by multiplying the per person award by the stipulated number of class members, and arrived at the molded verdict. The trial court then entered judgment pursuant to Rule 1715(d), which required the court to specify who was bound by the judgment.

Bassett emphasizes that KMA waived any claim of error regarding the molding of the verdict by failing to raise a timely objection at trial. According to Bassett, the trial court's May 16th Order did not relieve KMA of the obligation to object when the trial court molded the verdict.[28] Bassett

**28.** Bassett postulates that, in addressing claims proceedings in the May 16th Order, the trial court anticipated proceedings related to individual UTPCPL claims, election of remedies, or required affirmations of fact, which were then rendered moot by the evidence introduced at trial. But, the record contains no specific support for Bassett's assertions and

regards as "dubious" KMA's position that it detrimentally relied on the May 16th Order to reserve its defenses until an evidentiary claims proceedings phase. Bassett points out that KMA failed to identify any defenses that it was allegedly prevented from asserting at trial. Bassett also reemphasizes that the nature of her proof and of the class proceedings was known or should have been known to KMA and its attorneys, who failed to object at any time to class-wide proof of damages, or to the jury questionnaire, or to the molding of the verdict. Thus, Bassett says, KMA's assignment of error via post-verdict motions and on appeal is untimely. Finally, Bassett offers her own due process and fairness arguments in support of maintaining the class and sustaining the verdict.[29]

In its reply brief, KMA asserts that its objection to the molded verdict was timely, because the first appropriate opportunity to object was in its motion for post-trial relief; the

we express no opinion regarding the trial court's purpose for referring to claims proceedings in its May 16th Order.

29. As a separate issue, Bassett also argues in a footnote that KMA waived all of its appellate arguments by failing to move for decertification before or after trial. Bassett's Brief at 48–49 n. 27. In its reply brief, KMA responds that, pursuant to Rule 1710, a party may seek decertification at any stage, including on appeal, "before the final appeal is exhausted." According to KMA, a party is not required to file for decertification in order to preserve its arguments regarding class certification on appeal. KMA's Reply Brief at 10–11 & n. 10. Both parties conflate two separate concepts: decertification by the trial court and appellate review of a trial court certification decision. Thus, only the trial court may decertify a class pursuant to Rule 1710(d), which, as a Rule of Civil Procedure, governs practice and procedure in the courts of common pleas. Practice and procedure in the appellate courts is governed by the Rules of Appellate Procedure. Pa.R.A.P. 103. Rule 1710(d) plainly states that a decertification decision is proper only "before a decision on the merits." Pa.R.C.P. No. 1710(d). But, filing a motion to decertify is optional and failure to move for decertification does not waive a party's claims of error on appeal regarding the trial court's initial certification decision. Appellate courts review a trial court decision under an abuse of discretion standard and may order the judgment vacated or reversed, on the basis that certification was erroneous, with the ultimate result that the class is decertified. *See, e.g., Debbs,* 810 A.2d at 164 (judgment vacated with direction for trial court to decertify the class). Here, KMA's decision to forego filing a motion to decertify did not waive its claims of error regarding the initial certification of the class, the sufficiency and weight of the evidence to support the judgment, or the molding of the verdict.

post-trial motion gave the trial court "every opportunity to correct its error." KMA's Reply Brief at 12 n. 12. According to KMA, the jury questionnaire, which referenced damages of each class member, was consistent with the May 16th Order, which, according to KMA, required that "there **would be** claims proceedings in which each class member **would have to prove** entitlement to a recovery." *Id.* (emphasis in the original). Thus, the molding of the verdict created the inconsistency to which, KMA states, its timely objection was raised. *Id.*

In its Rule 1925(b) statement, KMA raised the molding of the verdict issue in terms similar to those in its appellate brief to this Court. Unfortunately, the trial court addressed the narrower (and somewhat different) issue of whether there was error in its denial of the motion to bifurcate the damages and liability phases of trial. The court concluded that bifurcation was not necessary because the risk of prejudice against the defendant, common, for example, in catastrophic personal injury cases, was not present here. Tr. Ct. Op., 12/29/06, at 39. The Superior Court agreed and affirmed the judgment on the molded verdict. The panel also added that the record contained sufficient evidence to support a verdict of $600 per class member (and indeed of up to $1,005). According to the court, "all class members were entitled to have good brakes on their cars that did not require repeated trips to the dealership for replacement to avoid brake failure." Super. Ct. Op., 10/24/07, at 3–4. We address each of KMA's related claims separately.

### A. Class Certification Decision and Sufficiency of the Evidence

KMA argues that the molding of the verdict was improper because evidence as to Bassett's claim was not probative of the claims of other class members and, as a result, the class failed to carry its burden of proof at trial. The car manufacturer essentially incorporates and re-asserts its prior claims of trial court error regarding the sufficiency and weight of the evidence to justify the jury's verdict as the basis for its due process argument. We have already discussed at length and

dismissed KMA's prior claims. Accordingly, we also reject this repetitive claim. *Jackson, supra.*

## B. Effect of May 16th Order

 KMA argues that the molding of the verdict was erroneous in light of the May 16th Order. In April 2005, KMA filed a motion to bifurcate, seeking separate trials on common issues from issues that it identified as individual, *i.e.,* defect manifestation, notice and opportunity to cure, causation, and damages. According to KMA, its request was for a court order "confirming that issues of fact and law identified by KMA [t]herein [would] be adjudicated in future, class-member-specific proceedings, in the event that [Bassett] prevail[ed] in the . . . common issue trial." *See* KMA's Motion to Bifurcate, 4/25/05, at 14, 19. The trial court denied the motion and stated that "class members' entitlement to recover[,] if plaintiff class prevails, shall be determined at class proceedings." Tr. Ct. Order, 5/16/05. Thereafter, the parties proceeded to trial and Bassett introduced evidence to prove the claims of all the members of the class.

On May 25 and 26, 2005, the trial court conferred in chambers with both parties regarding their requested jury instructions and the jury verdict sheet, and sought to provide prompt resolution to the parties' objections. The court described its jury instructions and jury questions in terms of amount "sustained by each class member," *inter alia,* "for repair expenses as a result of defendant's breach of warranty." The trial court asked if there were any objections to the questions on the jury verdict form as explained and KMA's counsel responded "No, Your Honor." N.T., 5/25/05, Vol. 7, at 70–73. Both the jury instructions and the verdict form reflected the discussion in chambers. Indeed, after providing a description of the damages requested by the class in its charge to the jury, the court explained: "[b]ecause you're rendering a verdict for each class member, I will take care of making sure that the Class members recover." At sidebar, immediately after the damages instruction, the court again asked attorneys for both parties if there were any objections to the charge and

the attorneys responded in the negative. N.T., 5/26/05, Vol. 3, at 50–53. The court then released the jury for deliberations.

The questions on the verdict sheet, in relevant part and with the jury's answers, read:

Question No. 1:

Did [KMA] breach its express warranty on the cars purchased by the class?

<u>X</u> Yes ___ No

\* \* \*

Question No. 5:

State the amount of damages if any, sustained by each Class member:

b) For repair expenses, reasonably incurred, as a result of [KMA]'s breach of warranty.

$ <u>600.00</u>

Jury Verdict Special Interrogatories, 5/27/05; *accord* N.T., 5/27/05, Verdict, at 3–8.

After the trial court recorded the jury's answers to the questions on the verdict slip, the court multiplied the $600 damages award by the agreed-upon number of class members—9,402—and recorded a verdict of $5,641,200 on behalf of the class. After dismissing the jury, the court asked the parties if there was anything further they wished to address at that time. Counsel for KMA answered "No, Your Honor. Thanks to the Court." The court concluded proceedings. N.T., 5/27/05, Verdict, at 4–8.

On appeal, KMA concedes that it raised an objection to the molding of the verdict premised on the May 16th Order for the first time in its post-trial motion, re-asserted it in its Rule 1925(b) statement, and argues that such an objection afforded the trial court sufficient opportunity to correct its error. In the Rule 1925(b) statement, KMA asserted that Bassett had consented to undertake post-verdict claims proceedings to determine each class member's entitlement to recover, yet the trial court "*sua sponte* and in derogation of its own order on bifurcation, transformed this bifurcated class action trial into a

unitary verdict in favor of the class." The manufacturer also raised an alternate, facially contradictory, argument that "[t]he time for determining whether class members have claims against KMA is at trial, not 'at claims proceedings' following trial and verdict." KMA's Concise Statement of Matters Complained of on Appeal, ¶ 3. KMA had initially asserted the latter, but not the former, argument in its post-trial motion for a judgment notwithstanding the verdict. KMA's Motion for Post–Trial Relief, ¶ 9. On appeal, KMA insists that absent reversal and decertification of the class, KMA's due process rights will have been violated. KMA's Brief at 30–32; KMA's Reply Brief at 12 n. 12.[30]

We disagree with KMA that its objection, which it concedes was offered for the first time in a post-trial motion, was timely under the circumstances. Under prevailing Pennsylvania law, a timely objection is required to preserve an issue for appeal. Pa.R.C.P. No. 227.1(b)(1) & n.; Pa.R.A.P. 302; *Straub v. Cherne Indus.*, 583 Pa. 608, 880 A.2d 561, 567 (2005); *Dilliplaine v. Lehigh Valley Trust Co.*, 457 Pa. 255, 322 A.2d 114, 116–17 (1974). Here, KMA failed to object to the verdict sheets when composed and offered to the jury, to the related jury charge, or, at the latest, contemporaneous with the actual molding of the verdict. As a result, the issue of whether the May 16th Order precluded the trial court from molding the verdict was waived.

The substance of the trial court's May 16th Order does not affect this conclusion. This Court's *Straub* decision is particularly instructive. In *Straub*, after the parties rested, the trial court discussed the verdict sheets with the parties and stated that it aimed to explain to the jury that the plaintiffs were forwarding two independent claims, and that the plaintiffs

30. In a brief footnote, KMA also states that "claims proceedings" referenced in the May 16th Order amounted to a concession by the trial court that the class was improperly certified. KMA's Brief at 30 n. 18. KMA cites no legal support for its argument. Indeed, claims proceedings are a recognized, albeit not required, feature of determining damages post-verdict in class actions. *See generally* Allan Erbsen, *From "Predominance" to "Resolvability": A New Approach to Regulating Class Actions,* 58 Vand. L.Rev. 995 (2005).

could win on one claim but lose on the other or vice versa. The parties agreed and the trial court issued its instruction. The jury returned a verdict in favor of the plaintiffs on one claim but not on the second. The defendant did not object to the jury questionnaire, the trial court's instructions, or the jury's verdict. Then, in post-trial motions, the defendant sought a judgment notwithstanding the verdict on the ground that once the jury found that the product was not defective respecting the first claim, it should have found in its favor on all counts. The trial court did not rule on the post-verdict motions and entered judgment on the verdict; the Superior Court reversed and remanded. This Court, however, held that the Superior Court erred in rejecting the plaintiffs' waiver argument and reversed. We concluded that the defendant premised its claim of error "on the argument that the jury's verdict was incompatible with a principle of law." But, this alleged error should have been evident when the verdict sheets and the trial instructions were agreed upon and formulated. Yet, the defendant did not object to the verdict sheets, to the trial court's related instructions, or "to the verdict itself when it was rendered." By failing to object, the defendant had waived its claim. 880 A.2d at 567.

■ Here, we have a similar scenario. KMA argues that the molded verdict was incompatible with the May 16th Order, which it poses as the law of the case, and upon which it claims it relied to allegedly forego pursuit of undisclosed defenses to the class claims.[31] Pursuant to *Straub*, however, this so-called reliance was not sufficient to excuse KMA's obligation to raise a timely objection when, in its view (as alleged now), the court acted contrary to the prior order. KMA should have objected

31. KMA's description of the claims proceedings mentioned in the May 16th Order is nebulous and, at times, suggests proceedings very expansive in scope, which would encompass individual trials of each class member's claims with respect to reliance, manifestation, notice and opportunity to cure, causation, and damages. But, the trial court denied KMA's motion to bifurcate, which had expressly requested separate trials on these "individual" issues. To interpret the May 16th Order as nonetheless permitting what it expressly denied and to credit KMA's purported reliance on it in either not asserting defenses or objecting is not tenable.

contemporaneously to the jury questionnaire or, at the latest, contemporaneously to the actual molding of the verdict in order to give the trial court a contemporaneous opportunity to address the alleged error and to preserve the present issue for appeal. Indeed, the object of contemporaneous objection requirements respecting trial-related issues is to allow the court to take corrective measures and thereby to avert the time and expense of appeals or new trials. *See Criswell v. King*, 575 Pa. 34, 834 A.2d 505, 509–10 (2003) (listing policy considerations behind contemporaneous objection requirement). KMA simply did not do that here. As a result, the manufacturer's claim of error in the molding of the verdict, premised upon a supposed inconsistency with the May 16th order, is waived for failure to record a contemporaneous objection.

## IV. Authority of Trial Court to Enter Counsel Fee Order

Next, KMA argues that the counsel fee award should be vacated because, when the award was issued, the trial court had been deprived of jurisdiction by KMA's appeal from the judgment on the verdict. According to KMA, Bassett entered judgment pursuant to Rule 227.4(1)(b) on October 25, 2005, while the attorney's fee petition of June 6, 2005, was still pending. *See* Pa.R.C.P. No. 227.4(1)(b) (upon party's praecipe, prothonotary to enter final judgment on jury's verdict if court does not dispose of all post-trial motions within one hundred twenty days after filing of first post-trial motion). The manufacturer appealed the judgment on October 28, 2005, and the trial court decided the fee petition on January 23, 2006, nearly three months later. According to KMA, the MMWA requires that the counsel "fee award be entered 'as part of' the underlying judgment." But, here, the trial court issued the fee award months after and, thus, it was not part of the final judgment entered. The manufacturer argues that, pursuant to Rule of Appellate Procedure 1701(a), the trial court no longer had jurisdiction to act on the petition for counsel fees once Bassett entered voluntary judgment on the verdict. Pa.R.A.P. 1701(a) ("Except as otherwise prescribed by these rules, after an appeal is taken ... the trial court ...

may no longer proceed further in the matter."). Thus, KMA asserts that the trial court's award of counsel fees should be vacated. *See* KMA's Brief at 34.[32]

Bassett answers that the award of costs was proper. She recognizes that the MMWA is the statute authorizing legal fees here, but argues that matters of trial court jurisdiction and procedure related to the award of attorneys' fees are governed by Pennsylvania law and rules. According to Bassett, petitions for attorneys' fees are ancillary to the judgment on the merits and the trial court does not lose jurisdiction to decide them separately after an appeal on the merits is filed. Bassett's Brief at 49–50 (citing *Old Forge Sch. Dist. v. Highmark Inc.*, 592 Pa. 307, 924 A.2d 1205 (2007); *Miller Elec. Co. v. DeWeese*, 589 Pa. 167, 907 A.2d 1051 (2006) (*"Miller"*)). Bassett notes that the MMWA does not control trial and appellate jurisdiction in Pennsylvania. Indeed, Bassett claims that the U.S. Supreme Court has recognized that counsel fees may be awarded separately from the judgment on the verdict and later incorporated into the judgment. *Id.* at 51 (citing *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 200, 108 S.Ct. 1717, 100 L.Ed.2d 178 (1988)).

The trial court agreed with Bassett that the fee petition and award were timely. According to the court, issues regarding attorneys' fees and costs are collateral or ancillary to the merits and may be addressed by the trial court after an appeal has been filed. Entry of judgment and the appeal therefore did not divest the court of jurisdiction to decide Bassett's pending fee petition. Tr. Ct. Supp. Op.—Findings of Facts &

32. KMA cites two cases from our sister states in support of its claim. *See* KMA's Brief at 35 (*Stenger v. LLC Corp.*, 819 N.E.2d 480 (Ind.App. 2004); *Glandon v. Daimler Chrysler Corp.*, 142 S.W.3d 174 (Mo.App. 2004)). Notably, both cases are distinguishable. In *Stenger*, the parties settled the case and the court held that, as a result, plaintiff was not a "prevailing party" entitled to attorneys' fees under the MMWA unless the settlement agreement provided for fees. 819 N.E.2d at 484. In *Glandon*, the court of appeals quashed the plaintiff's appeal from the trial court's order denying a motion for attorneys' fees on the ground that such an application was not a cognizable after-trial motion following entry of a consent judgment. 142 S.W.3d at 178. Neither decision is persuasive nor do the cases inform our decision on the issue before us.

Conclusions of Law, 11/14/07, ¶ 122 (citing *Budinich, supra; Miller, supra; Rosen v. Rosen,* 520 Pa. 19, 549 A.2d 561 (1988)). The Superior Court affirmed without further addressing this issue.

■■■ Rule 1701 provides that "[e]xcept as otherwise prescribed by these rules, after an appeal is taken ... the trial court ... may no longer proceed further in the matter." Pa.R.A.P. 1701(a). But, after an appeal is taken, the trial court may take other action "ancillary to the appeal." Pa. R.A.P. 1701(b)(1). In Pennsylvania, the trial court's action on a petition for counsel fees has been deemed to be ancillary to the appeal from the judgment on the merits. *Miller,* 907 A.2d at 1057. Therefore, if the petition for counsel fees is timely filed, the trial court is empowered to act on it after an appeal was taken.

Pursuant to the MMWA, a consumer who prevails on a claim under that statute or on a claim for breach of warranty may recover "as part of the judgment" the reasonably incurred "amount of cost and expenses (including attorneys' fees based on actual time expended)." 15 U.S.C. § 2310(d)(2).[33] In *Budinich,* the U.S. Supreme Court recognized that statutes and decisional law authorizing counsel fees are inconsistent in characterizing the fees as either costs or part of the merits judgment. 486 U.S. at 201, 108 S.Ct. 1717. But, the Court noted that, as a general matter, "a claim for attorney's fees is not part of the merits of the action to which the fees pertain. Such an award does not remedy the injury giving rise to the action, and indeed is often available to the party defending the action." *Id.* at 200, 108 S.Ct. 1717. The Court also stated that "[a]t common law, attorney's fees were regarded as an element of 'costs' awarded to the prevailing party, which are not generally treated as part of the merits judgment. Many federal statutes providing for attorney's fees continue to speci-

33. Section 2310 conditions the award of costs on a consumer's success on the merits and places the task of awarding costs within the bailiwick of the court. Thus, as a practical matter, where the case is tried to a jury, the proceedings on attorneys' fees (with the court acting as factfinder) necessarily take place after and separately from the trial on the merits to a verdict.

fy that they are to be taxed and collected as 'costs.' " *Id.* at 200–01, 108 S.Ct. 1717 (citations omitted).

As here, the statute at issue in *Budinich* provided that the "judgment" would "include a reasonable attorney fee in favor of the winning party, to be taxed as part of the costs of the action." *Id.* at 197, 108 S.Ct. 1717 (citing Colo.Rev.Stat. 8–4–114 (1986)). The prevailing plaintiff took judgment on the jury's verdict on March 26, 1984, and the defendant filed post-trial motions, which were denied May 14, 1984. The district court issued its final order concerning attorneys' fees on August 1, 1984. The defendant took its only appeal on August 19, 1984, as to all issues. The U.S. Supreme Court held that the appeal was untimely as to all issues except the attorneys' fees. According to the Court, the judgment on the merits was final and appealable on May 14, 1984, and its finality did "not turn upon the characterization of [attorneys'] fees by the statute or decisional law that authorizes them." *Id.* at 201, 108 S.Ct. 1717. The High Court explained that the important value at stake in adopting this uniform interpretation of finality was the "preservation of operational consistency and predictability" with respect to jurisdictional and procedural rules governing the time to appeal. *Id.* at 202, 108 S.Ct. 1717.

■ Like the Colorado statute at issue in *Budinich,* the MMWA describes the same paradoxical characterization of attorneys' fees as both a "cost" of litigation and "as part of the judgment." 15 U.S.C. § 2310(d)(2). In the interpretation of the U.S. Supreme Court, similar statutory language conveyed no legislative intent to modify jurisdictional and procedural rules applicable to determine the finality of an order for purposes of appeal. Following the High Court's lead, we hold that the trial court's authority to proceed on the petition for attorneys' fees "does not turn" on the MMWA's characterization of those fees. We have no reason to believe that, if faced with this question, the High Court would decide otherwise. *Council 13, Am. Fed'n of State, County & Mun. Employees, AFL–CIO v. Rendell,* 604 Pa. 352, 986 A.2d 63, 77 (2009) (*"Council 13 "*) ("It is fundamental that by virtue of the Supremacy Clause, the State courts are bound by the deci-

sions of the Supreme Court with respect to ... federal law, and must adhere to extant Supreme Court jurisprudence.").

Similar to the U.S. Supreme Court, we have a strong interest in the preservation of consistency and predictability in the operation of our appellate process. Pennsylvania law is well established that a petition for attorneys' fees is an ancillary matter, which the trial court retains authority to decide after entry of judgment on the verdict. Here, there is no dispute that the application for attorneys' fees was timely when filed on June 6, 2005. Accordingly, the trial court was authorized to decide Bassett's application for attorneys' fees in January 2006, irrespective of KMA's appeal on October 28, 2005, from the judgment on the verdict dated October 25, 2005. We must reject KMA's request for relief from the fee award on this ground.[34]

## V. Counsel Fee Enhancement

Finally, KMA argues that the Superior Court erred in affirming the trial court's application of a "risk multiplier" to the attorneys' fees award under the MMWA. According to KMA, the U.S. Supreme Court "prohibited" risk multipliers in federal fee shifting cases and, because fees were awarded here pursuant to a federal statute—the MMWA—state courts are bound by that interpretation. KMA's Brief at 35–36 (citing *City of Burlington v. Dague*, 505 U.S. 557, 559, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992); U.S. CONST., Art. VI, Cl. 2). KMA states that the lower courts ignored *Dague* to rely on a distinguishable Pennsylvania Superior Court case, *Signora v. Liberty Travel, Inc.*, 886 A.2d 284 (Pa.Super.2005), in awarding the enhanced fee. KMA notes that in *Signora*, attorneys' fees were awarded pursuant to a Pennsylvania statute rather

---

**34.** In reality, even if we were to adopt KMA's interpretation of the MMWA, we would still reject the manufacturer's prayer for relief. If attorneys' fees had to be awarded as part of the judgment, then the October 2005 judgment would have been interlocutory given that the counsel fees matter was still pending. This would require us to vacate the Superior Court's decision of October 2007 with directions to quash KMA's appeal. Moreover, because in its second appeal KMA challenged only the attorneys' fees, any other issues would have been waived. *See Budinich, supra.*

than a federal statute. And, citing the U.S. Supreme Court's opinion in *Dague,* the *Signora* panel observed that federal statutes do not permit enhancement for risk. *Id.* at 293 n. 14. KMA posits that this Court is bound by U.S. Supreme Court precedent in this matter and should vacate the award of the enhanced fee as contravening that precedent.

Bassett responds that Pennsylvania law, not federal law, controls the award of the fee enhancement in this case for several reasons. First, she claims that the *Dague* decision was limited to the environmental statutes addressed by the High Court. Second, according to Bassett, calculation of attorneys' fees is a matter of exclusive state procedure, not of substantive law. Bassett's Brief at 52 (citing *Middlesex County Ethics Comm. v. Garden State Bar Ass'n,* 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982); *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975); *Arons v. New Jersey State Bd. of Educ.,* 842 F.2d 58 (3d Cir.1988)). Consequently, in Bassett's view, federal fee-shifting provisions cannot override or displace state rules governing the award of attorneys' fees. *Id.* at 54 (citing *Chin v. Chrysler LLC,* 538 F.3d 272, 279–80 & n. 5 (3d Cir.2008)). She also insists that the MMWA does not preempt Pennsylvania law with regard to attorneys' fees and the application of the risk multiplier. *Id.* at 55 (citing 15 U.S.C. § 2311(b)(1)).

Finally, Bassett emphasizes that Pennsylvania has a strong public policy to fully compensate parties that incur attorneys' fees where a statute permits fee-shifting. *Id.* (quoting *Solebury Twp. v. Dep't of Envtl. Prot.,* 593 Pa. 146, 928 A.2d 990, 1004 (2007) ("federal standards that have not been incorporated into state statutes can only be supported to the extent that those standards are consistent with Pennsylvania public policy")). According to Bassett, the discretion of state courts to award attorneys' fees is broader than that of federal courts in purely federal cases and, as a result, state courts may adjust the lodestar. *Id.* at 55–56 (citing *Signora,* 886 A.2d at 293 & n. 14; *Skelton v. Gen. Motors Corp.,* 860 F.2d 250 (7th Cir.1988); *Krebs v. United Ref. Co. of Pennsylvania,* 893 A.2d 776 (Pa.Super.2006); *Croft v. P & W Foreign Car Serv., Inc.,*

383 Pa.Super. 435, 557 A.2d 18 (1989)). Bassett claims that to fulfill the consumer-friendly purposes of the MMWA's fee-shifting provision, accounting for the nature of the services, amount of time expended, results obtained, amounts recovered, and for the contingent nature of the fee arrangement, via the application of a risk multiplier, is integral. *Id.* at 58–61. Bassett asserts that Pennsylvania Rule of Civil Procedure 1716 reflects these considerations and controls the "discretionary determination of a 'reasonable' class fee by the Commonwealth's courts." [35] *Id.* at 57 (citing Pa.R.C.P. No. 1716). Also, Bassett avers, the performance of class counsel in this class action met the "exceptional case" standard and an award of a fee enhancement therefore was appropriate. *Id.* at 62 (quoting *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 483 U.S. 711, 728, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987) ("*Delaware Valley* ")).

In its reply brief, KMA briefly reiterates the arguments in its main appellate brief and adds that application of a risk multiplier is in plain conflict with the language of Section 2310 of the MMWA. According to KMA, the *Dague* decision applies to all federal fee-shifting statutes, including the MMWA.

The trial court agreed with Bassett that class counsel was entitled to an attorneys' fee award equal to a risk multiplier of 1.375 times the $3 million lodestar, for a total of $4.125 million.[36] The court stated that it had discretion to adjust the lodestar upwards by applying a risk multiplier where class counsel had taken the case for a contingent fee. Tr. Ct. Op., 11/14/07, at 11 (citing *Signora, supra* ). According to the court, whether a fee enhancement is appropriate requires consideration of several factors: that a contingent fee case is significantly riskier than an hourly fee case, what fee would attract competent counsel, and whether the prevailing class

35. Bassett adds that the attorneys' fee question before us is also controlled by 41 P.S. § 503. But, Title 41 relates to maximum interest rates in mortgage transactions and Section 503 is the attorneys' fees provision applicable in disputes between mortgage debtors and lenders. Section 503 is, therefore, inapplicable here.

36. The court also included an award of $267,513.00 for costs and expenses of litigation. Tr. Ct. Op., 11/14/07, at 2.

would have obtained representation absent the potential for a fee adjustment. The court emphasized that the *Signora* court approved the exercise of discretion to adjust the lodestar by reference to Rule 1716 but noted that other Superior Court panels used additional criteria. *Id.* at 11–12 (citing *Logan v. Marks,* 704 A.2d 671 (Pa.Super.1997)). Against this legal background, the trial court concluded that a 1.375 risk multiplier was appropriate in view of the "extensive work, time, and effort devoted by both sides and specifically [Bassett's] lawyers...." *Id.* at 12. The Superior Court affirmed, quoting at length and without adding to the trial court's analysis of the risk multiplier issue.

Generally, where the award of attorneys' fees is authorized by statute, an appellate court reviews the propriety of the amount awarded by the trial court under an abuse of discretion standard. *Solebury Twp.,* 928 A.2d at 997 n. 8. We will not find an abuse of discretion in the award of counsel fees "merely because [we] might have reached a different conclusion." *Hoy v. Angelone,* 554 Pa. 134, 720 A.2d 745, 752 (1998). Rather, we require a showing of manifest unreasonableness, partiality, prejudice, bias, ill-will, or such lack of support in the law or record for the award to be clearly erroneous. *Id.* To the extent that the issue before us is a question of statutory interpretation, however, our scope of review is plenary and the standard of review is *de novo. Solebury Twp.,* 928 A.2d at 997 n. 8.

The authorizing statute here—the MMWA—is a federal statute. "The construction of a federal statute is a matter of federal law." *Council 13,* 986 A.2d at 80. Pursuant to federal rules of statutory construction, the courts consider the particular statutory language, as well as the design of the statute and its purposes in determining the meaning of a federal statute. *Id.* (citing *Crandon v. United States,* 494 U.S. 152, 158, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990)). But, if the MMWA's language is clear, we should refrain from searching other sources in support of a contrary result. *See Ali v. Fed. Bureau of Prisons,* 552 U.S. 214, 228, 128 S.Ct. 831, 169

L.Ed.2d 680 (2008) ("We are not at liberty to rewrite the statute to reflect a meaning we deem more desirable."); *Carter v. United States*, 530 U.S. 255, 271, 120 S.Ct. 2159, 147 L.Ed.2d 203 (2000) (statutory interpretation "begins by examining the text ... not by psychoanalyzing those who enacted it"); *United States v. Gonzales*, 520 U.S. 1, 6, 117 S.Ct. 1032, 137 L.Ed.2d 132 (1997) (where "[g]iven [a] straightforward statutory command, there is no reason to resort to legislative history"); *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) ("[I]n interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.' "). *Accord Dooner v. DiDonato*, 601 Pa. 209, 971 A.2d 1187, 1195 (2009) ("The language used by [Congress] is the best indication of its intent.").

> In relevant part, Section 2310 of the MMWA provides that: If a consumer finally prevails ... he may be allowed by the court to recover as part of the judgment a sum equal to the aggregate amount of cost and expenses (including **attorneys' fees based on actual time expended**) determined by the court to have been **reasonably incurred by the plaintiff** for or in connection with the commencement and prosecution of such action, unless the court in its discretion shall determine that such an award of attorneys' fees would be inappropriate.

15 U.S.C. § 2310(d)(2) (emphasis added). Here, there is no dispute that the MMWA authorizes an award of attorneys' fees to prevailing consumers such as Bassett and the class. 15 U.S.C. § 2310(d)(2). The salient question is whether, in view of the authorizing statute, the trial court abused its discretion in factoring the class counsel's risk into its calculation of the final award of attorneys' fees.

█ On its face, Section 2310(d)(2) contains no language authorizing a mandatory contingency multiplier nor does it

give the courts discretion to apply such a multiplier to supplement the actual fee. The provision explicitly states that attorneys' fees are to be "based on actual time expended," and does not provide for a discretionary fee enhancement. In practical terms, this means that the amount of attorneys' fees authorized by the MMWA is a factor of the actual hours expended and billed by the attorneys in the case—that is, the lodestar. *See Dague*, 505 U.S. at 559, 112 S.Ct. 2638 ("product of reasonable hours times a reasonable rate" is lodestar); *Stair v. Turtzo, Spry, Sbrocchi, Faul & Labarre*, 564 Pa. 305, 768 A.2d 299, 308 n. 8 (2001) (same). Thus, Section 2310(d)(2) specifically addresses fee awards and permits only fee awards equal to the lodestar, with no mention, much less approval, of a contrary scheme of fee enhancement such as a contingency multiplier. The plain language of Section 2310(d)(2) is clear and unambiguous regarding attorneys' fees equaling the lodestar.[37]

 Moreover, even assuming *arguendo* that Section 2310(d)(2) is subject to a construction contrary to its plain terms, U.S. Supreme Court precedent provides additional strong legal support for KMA's position that the statute does not allow for a contingency multiplier in the present circum-

---

**37.** We are aware that in *Skelton*, 860 F.2d 250, the Seventh Circuit Court of Appeals rejected this plain language reading. The *Skelton* court held that contingency multipliers are available in cases where the parties settle a MMWA claim and create a class settlement/common fund from which the plaintiff-class has to pay its attorneys. The court also noted material differences in the policies that support applying contingency multipliers to an attorney fee awarded under the common fund/settlement agreement and to a fee awarded under a statutory fee-shifting provision. Then, in *dicta*, the court opined that contingency multipliers would be available in MMWA statutory fee cases in light of the U.S. Supreme Court's plurality decision and Justice O'Connor's concurrence in *Delaware Valley*, 483 U.S. 711, 107 S.Ct. 3078. The court also suggested that the plain language of the MMWA does not preclude application of a contingency multiplier which "multiplies the lodestar by a number representing the probability of loss [as the fee awarded would continue to be] based on the number of hours the attorneys worked." *Skelton*, 860 F.2d at 257. Notably, in *Dague*, the U.S. Supreme Court specifically discussed *Delaware Valley* and rejected contingency multipliers. In addition, the Seventh Circuit's analysis was in *dicta* and is neither binding on this Court nor persuasive, as explained further *infra*.

stances. Congress qualified the right of consumer-plaintiffs to recover costs and expenses, limiting recovery to those costs and expenses "reasonably incurred." *See* 15 U.S.C. § 2310(d)(2). Controlling case law from the U.S. Supreme Court directs that the "reasonable hours times reasonable rate" lodestar is strongly presumed to be a "reasonable" attorney fee. *Dague*, 505 U.S. at 562, 112 S.Ct. 2638; *see also Perdue v. Kenny A.*, 559 U.S. ——, 130 S.Ct. 1662, 1669, 176 L.Ed.2d 494 (2010). The *Dague* Court further held that a contingency multiplier is generally incompatible with Congressional intent that only "reasonable" attorneys' fees could be recovered under federal fee-shifting statutes. *Dague*, 505 U.S. at 562–67, 112 S.Ct. 2638.[38] The High Court made plain that its consideration extended to federal fee-shifting statutes in general and that the Court intended to speak broadly to provide general guidance. *Dague* clearly indicated that it intended its analysis of the contingency multiplier to extend to "all" federal fee-shifting statutes, as follows:

> [The Clean Water Act and the Solid Waste Disposal Act] authorize a court to "award costs of litigation (including *reasonable attorney . . . fees* )" to a "prevailing or substantially prevailing party." This language is similar to that of

38. Unlike the MMWA, which provides for calculation of reasonable attorney's fees "based on actual time expended," the statutes pursuant to which attorneys' fees were awarded in *Dague* and *Perdue* provided simply for the award of a "reasonable" attorney's fee as part of the costs. In *Perdue*, the Court clarified its *Dague* holding and explained that a fee determined by the lodestar method is strongly presumed reasonable but may be enhanced in very "rare" and "exceptional" circumstances, *i.e.*, (1) "when the hourly rate employed in the lodestar calculation does not adequately measure the attorney's true market value, as demonstrated in part during litigation;" (2) "if the attorney's performance includes an extraordinary outlay of expenses and the litigation is exceptionally protracted;" and (3) in "extraordinary circumstances in which an attorney's performance involves exceptional delay in the payment of fees." *Perdue*, 559 U.S. at ——, 130 S.Ct. at 1674–75. Foremost, however, the High Court rejected the claim that "either the quality of an attorney's performance or the results obtained are [different] factors that may properly provide a basis for an enhancement," as these were already subsumed in the lodestar calculation. *Id.* at 1673–74. Moreover, we note, there has been no suggestion in this case that rare and exceptional circumstances justify application of a contingency multiplier.

many other federal fee-shifting statutes, *see, e.g.*, 42 U.S.C. §§ 1988, 2000e–5(k), 7604(d); our case law construing what is a reasonable fee applies uniformly to all of them.

505 U.S. at 561–62, 112 S.Ct. 2638 (emphasis in original; internal citations omitted). The Supreme Court, of course, is the final word on federal statutory interpretation and our decisional mandate is to follow its teachings. *See Council 13*, 986 A.2d at 77 ("It is fundamental that by virtue of the Supremacy Clause, the State courts are bound by the decisions of the Supreme Court with respect to ... federal law, and must adhere to extant Supreme Court jurisprudence.").[39] Here, the lower courts failed to consider or apply the strong presumption in favor of equating the counsel fee with the lodestar; rather, the courts considered impermissible factors in enhancing the attorneys' fee award.

Bassett insists that the MMWA allows for enhancement of the attorneys' fee award beyond the lodestar by application of a risk multiplier. She claims essentially: (1) that *Dague's* holding was limited to the environmental statutes at issue in that case; (2) that the MMWA gives state courts discretion to award contingency multipliers available through state procedural rules; and (3) that Pennsylvania public policy supports the exercise of discretion in the application of a contingency multiplier to promote the pro-consumer purposes of the MMWA.[40] We must reject Bassett's arguments.

Bassett's argument that *Dague's* holding must be deemed limited to the environmental statutes "at issue" there, the

39. In light of the Supremacy Clause, any reliance by the class on cases that allowed a contingency multiplier based on Pennsylvania law or decisions pre-dating *Dague* is unavailing. *See Solebury Twp.*, 928 A.2d 990 (attorney fee award under Pennsylvania's Clean Streams Law, 35 P.S. § 691.307(b)); *Krebs*, 893 A.2d 776 (attorney fee award under Pennsylvania's Storage Tank and Spill Prevention Act, 35 P.S. § 6021.1305(f)); *Signora*, 886 A.2d 284 (attorney fee award under Pennsylvania's Wage Payment and Collection Law, 43 P.S. § 260.9a(f)). *See Croft*, 557 A.2d 18 (pre-dates *Dague* and does not address contingency multiplier but whether jury award in MMWA case acts as cap on attorney fee awards); *Skelton, supra* (pre-dates *Dague* and relies on a High Court opinion specifically rejected in *Dague* ).

40. Bassett's arguments were reordered for clarity and ease of discussion.

Solid Waste Disposal Act and the Clean Water Act, proceeds as follows. Section 2310(d)(2) of the MMWA is different from the fee-shifting provisions in *Dague*, Bassett argues, because it awards an "aggregate amount" of "expenses" in addition to costs as incurred by the consumer/plaintiff, which necessarily should include "contingent fees." Bassett's Brief at 54, 59–60. We recognize that the High Court concluded *Dague* by saying "we hold that enhancement for contingency is not permitted under the fee-shifting statutes **at issue**" and, of course, the MMWA was not specifically at issue. *Dague*, 505 U.S. at 567, 112 S.Ct. 2638 (emphasis added). Nevertheless, the Court's analysis made plain that its approach to reasonable fees under all such fee-shifting provisions was uniform. *Id.* at 561–62, 112 S.Ct. 2638 (caselaw construing what is a reasonable fee "applies uniformly to all" federal fee-shifting statutes); *accord Signora*, 886 A.2d at 293 n. 14 ("Enhancement for contingency is not permitted under federal fee shifting statutes.").

Writing for the *Dague* Court, Justice Antonin Scalia focused on whether a "reasonable" attorneys' fee award may include a contingency enhancement of the lodestar. The High Court concluded that the lodestar benefits from a "strong presumption" of reasonableness because it generally reflects the merits and difficulties of a case, *i.e.*, the risk of loss. For an attorney who expected a premium over his hourly rates when he or she accepted a contingency fee case, the "lodestar enhancement [would] amount[ ] to double counting" the risk of loss and is unreasonable. 505 U.S. at 562–63, 112 S.Ct. 2638. The Court also discussed various approaches to lodestar enhancement and decided that all the approaches suffered from similar infirmities: undesirable social costs (such as creating incentives to bring nonmeritorious claims and overcompensating cases with above-average chances of success), added incentives for burdensome satellite litigation over attorneys' fees, and inconsistency with the Court's general rejection of contingent fees. *Id.* at 563–66, 112 S.Ct. 2638 (rejecting, *inter alia*, the *Delaware Valley* approach, *see supra* at n. 2). Importantly, "reasonableness" of the attorneys' fees is the linchpin under the MMWA just as it was under the statutes analyzed in

*Dague. Compare* 15 U.S.C. § 2310(d)(2) (courts may award expenses, including attorneys' fees "reasonably incurred by the plaintiff") *with* 42 U.S.C. § 6972(e) (courts may award costs of litigation that include "reasonable attorney . . . fees") *and* 33 U.S.C. § 1365(d) (same). Bassett's argument regarding the limiting language notwithstanding, *Dague* plainly requires rejection of the non-textual contingency multiplier that the lower courts engrafted here onto the MMWA.

Bassett also insists that we limit the application of *Dague* to "federal-question [sic] cases pending only before the federal courts under exclusively federal statutes." Bassett's Brief at 54. According to Bassett, because the MMWA incorporates state law, it is "subject to state procedural rules and interpretations" and its variations regarding contract laws and counsel fee decisions. But, Bassett's description of the MMWA is inapt and her attempt to divorce the trial court's award of attorneys' fees here from the plain language of Section 2310 and controlling precedent is unavailing.

 The MMWA is an act that provides, *inter alia,* federal standards governing contents of warranties and minimum standards for warranties. *See, e.g.,* 15 U.S.C. §§ 2302, 2304, 2311(c). Failure to comply with the MMWA's requirements or prohibitions constitutes an unfair method of competition, in violation of 15 U.S.C. § 45. *See* 15 U.S.C. § 2310(b). The MMWA does not create a cause of action for breach of warranty, but it also does not preempt a breach of warranty claim or, generally, "any right or remedy of any consumer under State law." *See* 15 U.S.C. § 2311(b)(1). According to Section 2310(d)(1) of the MMWA, "a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter, **or** under a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief" in federal or state court, pursuant to appropriate jurisdictional requirements. 15 U.S.C. § 2310(d)(1) (emphasis added); *see* 15 U.S.C. § 2310(a)(3), (d)(3), (e). Thus, claims for violation of the MMWA and breach of warranty are separate causes of action that may be joined when filing suit in

state or federal court. If the consumer prevails on either cause of action, she is entitled to recover costs and expenses, as described in Section 2310(d)(2). Contrary to Bassett's assertions, we perceive no clear Congressional intent from the plain language or the statutory scheme of the MMWA that attorneys' fees would be calculated "subject to state procedural rules and interpretations." *Accord Chin,* 538 F.3d at 279–80 & n. 5 (holding that for New Jersey procedural rule permitting counsel fees to apply, consumers must have asserted New Jersey cause of action authorizing fees). Indeed, because Section 2310(d)(2) of the MMWA is a provision of a federal statute, we are bound in our interpretation of that provision by decisions of the U.S. Supreme Court by virtue of the Supremacy Clause. *Council 13, supra.*

In the same vein, Bassett argues that the award of attorneys' fees is traditionally a matter of procedure "exclusively" governed by state law and procedure, specifically Pennsylvania Rule of Civil Procedure 1716.[41] We recognize that the question of what in particular is substantive and what is procedural is not always clear. *See Laudenberger,* 436 A.2d at 155 (noting substantive effect of new procedural rule permitting pre-judgment interest). But that is not so in this instance where, given the interplay between the MMWA and Rule

41. Bassett cites three cases in which federal courts yielded to the authority of state courts to regulate the practice of law in those states. *See Middlesex County Ethics Comm.,* 457 U.S. at 432–35, 102 S.Ct. 2515 (New Jersey state bar disciplinary proceedings warranted federal court deference); *Goldfarb,* 421 U.S. at 782–83, 95 S.Ct. 2004 (minimum fee schedule published by county bar and enforced through prospect of professional discipline constituted "price-fixing" within meaning of federal act); *Arons,* 842 F.2d at 63 (New Jersey rule prohibiting non-attorney from receiving compensation for legal representation from client not preempted by federal act permitting lay representation in administrative hearing). Bassett perceives no distinction between the power to regulate the practice of law as a profession and the power to adopt rules of civil procedure, *e.g.,* with regard to attorneys' fees. But, these two powers, in Pennsylvania at least, are separate and distinguishable. *See* PA. CONST. Art. 5, § 10(c) ("The Supreme Court shall have the power to prescribe general rules governing practice, procedure and the conduct of all courts" and "for admission to the bar and to practice law"). The cases cited by Bassett provide no support for the proposition for which they are cited, *i.e.,* that attorneys' fees are "exclusively" governed by state law.

1716, the effect of accepting Bassett's argument would be to import the rule for substantive purposes so as to undo the express terms of the federal statute.

██ Bassett also looks to the MMWA's savings clause and concludes that Congress intended to preserve a consumer/plaintiff's right under state law, which in Pennsylvania—as Bassett would have it—permits a contingency multiplier. Bassett's Brief at 55, 60–61 (citing 15 U.S.C. § 2311(b)(1) ("Nothing in this chapter shall invalidate or restrict any right or remedy of any consumer under State law or any other Federal law.")). According to Bassett, the right to a contingency multiplier is vested and embodied in Pennsylvania procedural Rule 1716(5), which states, *inter alia*, that "[i]n all cases where the court is authorized under applicable law to fix the amount of counsel fees it shall consider, among other things ... whether the receipt of a fee was contingent on success." Even aside from *Dague*, we hold that the MMWA's savings clause is not applicable here and that no general "right" to a contingency multiplier exists in Pennsylvania.

Rule 1716 is a rule of procedure prescribed by this Court that does not purport to create any substantive right to a contingency multiplier in all cases. *See* PA. CONST. Art. V § 10(c) ("The Supreme Court shall have the power to prescribe general rules ... if such rules are consistent with this Constitution and neither abridge, enlarge nor modify the substantive rights of any litigant."). Under Pennsylvania law, the contingency multiplier of Rule 1716 cannot be fairly construed as a "right or remedy" that was intended to be preserved under the MMWA's savings clause so as to undo the express substantive terms of the federal statute.

██ Finally, we must reject Bassett's claim that Pennsylvania's "strong public policy to justly compensate parties who incur attorney fees" and are entitled to attorneys' fees under fee-shifting provisions justifies an application of the contingency multiplier here. Bassett's Brief at 55 (citing *Solebury Twp.*, 928 A.2d at 1004) (awarding attorney fee under Pennsyl-

vania's Clean Streams Law, 35 P.S. § 691.307(b)).[42] Pennsylvania generally adheres to the "American Rule," under which "a litigant cannot recover counsel fees from an adverse party unless there is express statutory authorization, a clear agreement of the parties, or some other established exception." *Trizechahn Gateway LLC v. Titus*, 601 Pa. 637, 976 A.2d 474, 482–83 (2009); *see Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247–70, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975) (providing exhaustive discussion of American Rule and concluding that Congress and not courts may dispense with it and devise new rules to reallocate costs between litigants). According to this standard, what Bassett identifies as a "strong public policy" is not sufficient to overcome the presumption that the American Rule applies. There is nothing inherently unjust about limiting this form of compensation to **actual** costs.[43] Moreover, like Congress, our General Assem-

---

**42.** Bassett also cites *Solebury Township* for the proposition that "federal standards that have not been incorporated into state statutes can only be supported to the extent that those standards are consistent with Pennsylvania public policy." Bassett's Brief at 55. But, in *Solebury Township*, this Court addressed the question of whether townships in whose favor formal judgment had not been entered were entitled to counsel fees pursuant to Pennsylvania's Clean Streams Law, which provided that the Environmental Hearing Board "may in its discretion order the payment of costs and attorney's fees it determines to have been reasonably incurred by such party in proceedings pursuant to this act." 35 P.S. § 691.307(b). The Board had relied on federal law awarding counsel fees to deny the townships' application for counsel fees, holding that the townships were not prevailing parties. We vacated the decision and held that the Board's restrictive application of the narrow federal criteria was not supported by the plain language of the fee-shifting provision of the Pennsylvania statute. *Solebury Township* is distinguishable because, at issue here is the interpretation of a federal, not a Pennsylvania statute, on which the High Court has final say pursuant to the Supremacy Clause.

**43.** Additionally, any easy dismissal of *Dague* on the ground that the MMWA operates to protect consumers cannot withstand scrutiny. The dual concerns regarding the economic feasibility of access to courts and attracting adequate representation existed and were addressed by the Supreme Court. The High Court rejected the contingency multiplier as a means to unduly reward attorneys. *Dague*, 505 U.S. at 563, 112 S.Ct. 2638 (fee-shifting "statutes were not designed as a form of economic relief to improve the financial lot of lawyers"); *see Stair*, 768 A.2d at 306–07 (attorneys do not have an "exclusive interest" in statutory fee award). The purpose of the MMWA is fully served by applying the

bly has created several exceptions to the American Rule extant in Pennsylvania—via fee-shifting provisions—that allow courts to award attorneys' fees as a remedy to well-defined parties. *See* 42 Pa.C.S. § 2503 (listing categories of litigants who may receive attorney fee awards); *Lucchino v. Commonwealth,* 570 Pa. 277, 809 A.2d 264, 267–68 (2002) (listing Pennsylvania statutes with fee-shifting provisions). We cannot torture our procedural rule to supplant the legislative prerogative.

Rule 1716's actual procedural purpose is as follows. With respect to authorized counsel fee awards under legislation, courts must weigh the considerations of Rule 1716 as a matter of procedure. *See, e.g., Signora, supra.* But, the procedural vehicle does not create the underlying entitlement. Here, the class requested attorneys' fees under a federal statute—the MMWA. The plain language of the MMWA and the High Court's clear precedent provide no basis to trigger our procedural rule. Applying *Dague* to the **federal** statute at issue here by no means interferes with Congressional intent to preserve distinct state rights or remedies. Accordingly, we reverse the order below to the extent it provides for enhancement of the attorneys' fee award beyond the amount of the lodestar.

## VI. Conclusion

For the foregoing reasons, we affirm in part and reverse in part the decisions of the Superior Court dated October 24, 2007, and February 8, 2008. Our reversal is limited to the lower courts' decision to permit application of a risk of loss multiplier to enhance the attorneys' fee award beyond the amount of the lodestar. We remand to the trial court for adjustment of the attorneys' fees in accordance with this Opinion. Jurisdiction is relinquished.

Justice GREENSPAN did not participate in the decision of this case.

statute according to its plain terms and does not open the door to importing non-textual additional incentives and rewards.

Justices EAKIN, BAER, TODD and McCAFFERY join the opinion.

Justice SAYLOR files a dissenting opinion.

Justice SAYLOR, dissenting.

I agree with the majority's rationale as it concerns the attorney-fee matters but dissent relative to the class treatment as it was administered by the trial court.

## I. Preface

Initially, the majority's overarching approach to this appeal appears to suggest liberality in favor of class certification. I have no objection, to the degree that this does—as the majority indicates and our rules prescribe—nothing more than indicate who the parties to the action will be. *See* Majority Opinion, at 396–97, 34 A.3d at 15–16 (quoting Pa.R.C.P. No. 1707, cmt.).

The difficulty we are seeing in the cases, however, is that many proponents of class treatment believe the judiciary concomitantly should bring about substantive changes in the law favorable to consumer classes. It seems, more often than not, that such innovations are not being presented to our courts as the matters of substantive law they truly represent. Rather, they are being passed off as if they were merely part and parcel of the procedural aspects of class treatment.

My intention is not to advance or criticize any particular position advanced in the legitimate, ongoing policy debate concerning what the substantive law should be in the class setting. It may be that changes are desirable. My point is that substantive modifications require choices among competing social policies, can have deep and wide-reaching social impact, and may implicate defendants' constitutional rights and entitlements.[1] Furthermore, substantive changes in the

1. One commentator summarized one facet of the tremendous controversy which has arisen over the employment of the class action device as follows:

> The academic literature examining this form of litigation has portrayed the class action at times as a savior, bringing about justice in an otherwise flawed system of individual adjudication, and other

law generally are most appropriate to legislative consideration. *See Program Admin. Servs., Inc. v. Dauphin County Gen. Auth.*, 593 Pa. 184, 192, 928 A.2d 1013, 1017–18 (2007) (explaining that "it is the Legislature's chief function to set public policy and the courts' role to enforce that policy, subject to constitutional limitations").

Accordingly, and in the first instance, it is essential to recognize substantive accretions for what they are. Moreover, even assuming judicial lawmaking is appropriate to facilitate collectivized litigation, there can be no legitimate dispute that substantive changes are well beyond the contemplation of the class action provisions presently reposited in our Civil Procedural Rules. *See* Pa.R.C.P. Class Actions, Explanatory Comment 1977 ("Many desirable approaches to class action problems involve substantive rather than procedural solutions.... These are beyond the power of the Procedural Rules."). Therefore, if such alterations of law are to occur, they must be overtly presented, considered, and sanctioned as matters of substance.

In the present case, the phenomenon of substantive inroads riding the coattails of class action procedure is most vividly illustrated with regard to the damages question. To develop this, in light of the breadth and complexity of the underlying litigation, it is necessary first to lay some supporting groundwork. Upon review of this background, I will discuss how class members were relieved of the obligation to present necessary, fair, and sufficient proofs concerning an unarguably individualized form of damages they sought—and the only form of damages they were awarded—namely, "out of pocket paid repair costs." N.T., May 26, 2005, Vol. 4, at 51 (jury charge).

## II. Background

In assessing the damages question, it is important to understand that there simply was no evidence of class-wide com-

times as a villain, serving to artificially expand defendant liability and create a specialty practice for entrepreneurial plaintiffs' lawyers. Martin H. Redish & Clifford W. Berlow, *The Class Action As Political Theory*, 85 Wash. U.L.Rev. 753, 754 (2007) (footnotes omitted).

monality relative to numerous factors affecting out-of-pocket costs, including the mileage of affected Sephias or the length of actual ownership by class members. Moreover, Appellees' own proofs established that many remedial measures were undertaken by KMA as warranty brake repairs at *no cost* to individual class members. *See, e.g.,* N.T., May 19, 2005, Vol. 1, at 92, 96–97 (testimony of Appellees' automotive expert). Given such substantial variables,[2] it seems plain that individual class members had markedly different experiences of personal expenditure to address Sephia brake problems. Certainly, Appellees never attempted to prove differently by accounting for the variables. Indeed, at various junctures throughout the pretrial and trial proceedings, class counsel conceded their presence and impact.[3]

Rather than addressing individualized damages on conventional terms, as required under ordinary substantive law, class

**2.** For the sake of readability, in the text above, I have identified only a few of the many, readily-discernible variables differentiating out-of-pocket expenditures by class members. Here, I note only that there are many others. *See, e.g.,* N.T., May 19, 2005, Vol. 3, at 18 (reflecting the testimony of Appellees' automotive expert that a "field fix" utilized by KMA had redressed the brake issue relative to some Sephia vehicles); *compare* N.T., May 19, 2005, Vol. 1, at 88 (containing the explanation of Appellees' expert that the named plaintiff's brake pads wore out at between 3,000 and 5,000 miles), *with* N.T., May 19, 2005, Vol. 3, at 22 (reflecting the same expert's testimony that other class members experienced brake pad life in the range of 10,000 miles).

**3.** For example, at the certification hearings, counsel for the named plaintiff (later class counsel) explained that, at times, "[t]he individuals had to pay for the repair. In other instances maybe [KMA] did cover it or did under goodwill." N.T., July 15, 2004, at 22–23; *accord* N.T., May 26, 2005, Vol. 4, at 57 (reflecting class counsel's comment in his closing remarks that "KMA did replace many, many defective pads and rotors for some people who owned Kia Sephias").

There is nothing unusual about the phenomenon that class actions encompass both common and individual questions. *See generally* Allan Erbsen, *From "Predominance" to "Resolvability": A New Approach to Regulating Class Actions,* 58 Vand. L.Rev. 995, 998–99 (2005) ("Factual distinctions at various levels of subtlety and materiality usually permeate the legal claims of putative class members, such that their collective claims raise both 'common' and 'individual' questions relevant to proving liability and damages." (footnote omitted)). As further developed below, the irregularities in this case pertain to the absence of a management approach which would fairly account for such material differences.

counsel repeatedly argued to the judge and the jury that—on account of the small amounts involved and the nature of a class action—there simply was no need for any sort of individualized assessments. *See, e.g.,* N.T., May 26, 2005, Vol. 4, at 113–14. For its part, the trial court, at the certification stage, did not concretely address how individualized damages matters would be managed. Instead, the court rested its approval of class treatment entirely on conclusory pronouncements indicating that damages issues simply were not a problem. *See Samuel–Bassett v. Kia Motors Am., Inc.,* No. 2199, Jan. Term 2001, *slip op.* at 18, 2004 WL 2173324 (C.P. Phila., Civ. Trial Div. Sep. 21, 2004) ("Neither do potential differences in individual damage claims based upon individual experiences and costs associated with attempts to repair the vehicle pose any serious management difficulty."); *id.* at 21 ("The damages herein are ascertainable, not de minimus and quite capable of determination. No problems exist herein for certification.").[4]

The looseness of the certification decision yielded ongoing controversy about how the certification was to operate and its impact on required substantive proofs.[5] At the pretrial stage, the uncertainties culminated in a surprising turn taken shortly before trial, during a discussion of KMA's motion to bifurcate. At this juncture, after consistently rejecting the notion that individualized treatment of *any* issues was necessary, both class counsel and the trial court cryptically agreed that some sort of undefined claims process would be necessary. This dialogue proceeded as follows:

> THE COURT: And [the] verdict will then set the upper limit of what [KMA] has to pay and then people will have to prove that they fit within whatever requirements qualify

---

4. Notably, from the outset, KMA argued to the court that individualized assessments were required. *See, e.g.,* N.T., July 15, 2004, at 50–51 ("What happened with Ms. Bassett doesn't provide any information or proof for the remainder of the class. It must be done individually.").

5. It is perhaps in light of the potential for misunderstandings of this kind ensuing from insufficiently reasoned class certification decisions that the federal appellate courts require of the district courts a "rigorous analysis" of the certification criteria. *See Wal–Mart Stores, Inc. v. Dukes,* —— U.S. ——, ——, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374 (2011) (citations omitted).

them to receive that upper limit, and if they had to pay twice or three times as much, it's because of the defect, they're out of luck, right?

[CLASS COUNSEL]: That's correct.

THE COURT: Okay.

N.T., May 16, 2005, Vol. 1, at 60. Such consensus was then memorialized in the pretrial order, referenced by the majority, specifying that "[e]ach class member's entitlement to recover if plaintiff class prevails, shall be determined at claims proceedings." Majority Opinion, at 42 (quoting *Samuel–Bassett v. KMA Motors of Am., Inc.*, No. 2199 Jan. Term 2001 (Order of May 16, 2005)).[6]

Despite this prescription for claims proceedings (which, conceptually, should have worked a major alteration in the path of the litigation), Appellees attempted at trial to quantify the out-of-pocket expenses incurred by absent class members via grossly generalized, hypothetical proof. In this regard, Appellees presented an "automotive expert" who indicated— based on assumptions that each class member paid for all relevant brake repairs and drove his vehicle 100,000 miles—all plaintiffs incurred $1,005 in damages. *See* N.T., May 19, 2005, Vol. 3, at 23–26. Two obvious deficiencies in the testimony were that: the first of the underlying assumptions was directly contrary to the record (not the least because it was well established that KMA already had paid for many of the repairs as warranty items, *see supra* note 3); and the second was in strong tension with common experience (since it seems highly unlikely that all of a class of 9,400 automobile owners would retain their vehicles for 100,000 miles).[7]

6. This order appeared to embody a variant of the traditional strategy for addressing individual issues in class actions, *i.e.,* bifurcation of the damages question. *See* 3 Newberg on Class Actions § 9:59 (4th ed.2002) ("After identifying common issues that would support class certification, and recognizing generally or specifically that individual issues would remain after common questions have been litigated, the chief judicial management tool for handling individual issues is to sever them for subsequent trial[.]"). Nevertheless, as further developed below, the order did not alleviate the burgeoning incongruities and misunderstandings.

7. Both the hypothetical and the responsive testimony also simply ignore many other readily discernable variables impacting out-of-pocket ex-

In response to defense criticisms of this evidence, class counsel, for his part, maintained before the jury that the class action procedural device alleviated his problems of substantive proof:

[Defense counsel] is a good guy, a good lawyer but this is a Class action and I think you have heard comments that distort Pennsylvania law with respect to how Class actions are handled. *This is not a case of 10,000 individual claimants in which case we would have the burden of bringing in everybody including everybody's individual damages.*

The whole notion of a Class action, why they exit [sic], is because if you can satisfy the court before it gets to the jury trial stage that the issues are common and the complaints of Ms. Samuel–Bassett are shared by all other members of the Class, then the court will certify by a judicial Order the action as a Class action and it may proceed to this trial. Ladies and Gentlemen, this case was certified by the Philadelphia Court of Common Pleas as a Class action. This court was satisfied after a hearing that the complaints that [sic] Ms. Samuel–Bassett were the complaints of the 10,000 members of the Class. But I don't ask any of you to accept what I tell you; I ask that you listen to the instruction of the court on this issue. Listen to Judge Bernstein's instruction. I believe he will tell you that *proof and evidence that we present as to Ms. Samuel–Bassett should be considered by you as evidence for the entire Class.* That's important. That's how Class actions work.

N.T., May 26, 2005, Vol. 4, at 113–14 (emphasis added).[8]

Finally, contradicting its pretrial order providing for claims proceedings, the trial court instructed the jurors that there would be no subsequent proceedings to decide anything.[9]

penditures by individual class members, which Appellees never attempted to discount. *See supra* note 2.

8. Certainly, counsel's comments in this regard were apt as to *common* issues. However, the remarks were not so qualified, and, as developed above, out-of-pocket damages cannot fairly be regarded as a common question.

9. The court stated:

## III. Discussion

In my view, the irregularities discussed above are manifestations of a core analytical problem, *i.e.*, the failure to distinguish between the procedural class action device and substantive legal innovations being employed to facilitate them, including adjustments to the plaintiffs' burden of proof. It could not be argued seriously that hypothetical testimony from an automotive expert—based upon underlying assumptions that are unsupported by the record, false, counterintuitive, and/or substantially under-representative of the range of actual variables affecting plaintiff costs—could support an out-of-pocket damages verdict in any individual case. Plainly, therefore, the trial court's decision to permit Appellees to use just this sort of testimony to justify such a verdict for 9,400 people was incongruous with Pennsylvania substantive law governing damages.[10]

> The amount that you award today must compensate the Class completely for all damage that you find has been proven, let me put it that way.
> Because *there's no second day in court.* Just like I said, we can't handle 10,000 individual cases and just like I said maybe the amount in question is too small to warrant a whole blown trial for every individual claim; well, just like we in court want only one case if we can reasonably and justly do it; likewise, the defendant only wants one case against them [sic]. So you damages, *your verdict is the only verdict in this claim for both sides. There's no second day in court.* Nobody can come back and say we forgot to bring this up or we discovered something tomorrow. Can't be done. You the jury are the only judges of the facts. *After you decide this case, this case is decided.*
> N.T., May 26, 2005, Vol. 3, at 49–50 (emphasis added).

10. Throughout this litigation, Appellees have repeatedly relied upon the federal district court's decision to certify a class action in their favor against KMA. *See, e.g.,* Brief for Appellees at 3–4. Significantly, however, the district court's supporting opinion actually recognized the necessity of individualized damages assessments relative out-of-pocket expenditures from the outset. *See Samuel–Bassett v. Kia Motors Am., Inc.,* 212 F.R.D. 271, 281 (E.D.Pa.2002) (explaining that elements of damages, other than diminution in value, are "reliant upon 'the intangible, subjective differences of each class member's circumstances,' and would likely require additional hearings to determine given that some individuals have undoubtedly expended more monies and incurred higher parts and labor costs to repair their vehicles than others."), *vacated and remanded* by. 357 F.3d 392 (3d Cir.2004); *id.* at 282 n. 2

The complexity of class action litigation, and the concomitant need for probing consideration of foundational questions concerning the appropriateness of full or partial class treatment, is apparent both from the many closely reasoned judicial opinions and the broad range of commentary on the subject. *See, e.g., Cimino v. Raymark Indus., Inc.,* 151 F.3d 297, 319–21 (5th Cir.1998). A judicious class certification decision requires the trial court to distinguish between common questions and individual ones, and to approve a litigation plan for fair and efficient administration which will provide appropriate treatment for both issue categories.[11] Where the

(indicating that "the individual questions at issue here largely concern the element of damages").

I note that, in some circumstances, some jurisdictions have accepted the use of statistical, surveying, and sampling techniques to fill this sort of evidentiary void. *See generally* Laurens Walker, *A Model Plan to Resolve Federal Class Action Cases By Jury Trial,* 88 Va. L.Rev. 405, 415–20 (2002). Such techniques are not universally and uncritically accepted, however. *See generally* 2 McLaughlin on Class Actions § 8:7 (6th ed.2010) (collecting cases). Moreover, whatever the merits of these sorts statistical and/or scientific techniques for approximating individualized damages in a class action, nothing of the sort was attempted here. Rather, and again, Appellees' "automotive expert" offered an opinion based on a hypothetical entailing unproven, demonstrably erroneous, and under-inclusive assumptions.

11. This point is made by one commentator as follows:

when a plaintiff asks a court to certify her as a representative of absent class members seeking damages, the court may do so only if it has a feasible plan for resolving factual and legal disputes regarding each element and defense applicable to each class member's claim and for eventually entering judgment for or against each class member. There must either be an opportunity for the parties to litigate individual claims or defenses, or a reason to believe that such an opportunity is not necessary to reach a judgment that accurately values class members' claims. The existence of individualized issues of fact and law unique to the circumstances of particular class members thus does not necessarily preclude certification if the court has a plan for coping with individual factual and legal inquiries. In practice, however, certification will not be possible when there is no manageable way of reaching a final judgment that resolves all factual and legal disputes relevant to each class member's entitlement to relief under applicable substantive law, and when one or more parties is unwilling to settle voluntarily.

Erbsen, *From "Predominance" to "Resolvability",* 58 Vand. L.Rev. at 1049.

Parenthetically, the majority cites Professor Erbsen's substantial work for the proposition that claims proceedings are not required in class

proponent of class certification fails to lay the necessary groundwork, the correct judicial response is to deny the certification. *See generally* 2 McLaughlin on Class Actions § 8:16 ("[C]ertification is not permissible where it relies on a damages model under which gross or aggregate damages would be calculated and awarded without considering whether each class member had a valid claim, thereby risking that the defendant would be liable for damages that it was not proved to have caused, or that some class members would recover damages that do not correspond to the true value of their claims."). As fundamentally, where class treatment is appropriate, the trial court must tailor class procedure to accommodate the governing substantive law, not the opposite.[12]

In the present case, certification of a 9,400–person class action occurred without the predicate, closely-reasoned justification or any rational plan for the handling of individualized issues.[13] Rather than redressing this fundamental misstep at any of several benchmark opportunities, Appellees continued to invite the trial court and the jurors to treat the substantive

actions. *See* Majority Opinion, at 45 n. 30. While this may be true, the majority does not capture the author's overarching point that *some* fair mechanism for individualized treatment of individualized issues is required.

12. Professor Erbsen's article provides the following explanation for why particular care in class action certification and management is required to protect all parties' rights and interests:

> The practical problems with certifying class actions despite dissimilarity among claims arise from the natural human instinct to simplify the inherently complex and to create order out of what appears chaotic. These instincts manifest in class actions in the form of procedural shortcuts to squeeze heterogeneous claims into a homogenous mold and thereby avoid the procedural difficulties that dissimilarity would create.... Likewise, aggregating distinct individual claims into a class obscures differences among class members in ways that engender substantive consequences.

Erbsen, *From "Predominance" to "Resolvability"*, 58 Vand. L.Rev. at 1009–10.

13. Indeed, this baseline reality of this case was reflected in the following impromptu comment by class counsel during the trial proceedings: "I don't know how, in the context of this Class Action, or in any Class Action, at a trial you could prove the amount of damages actually incurred by everyone." N.T., May 26, 2005, Vol. 3, at 19.

law as if were shaped by the certification of a class. Unfortunately, to a large degree, the trial court accommodated Appellees' vision of aggregate litigation. Thus, for example, Appellees' expert was permitted to testify to fictionalized class-wide out-of-pocket expenses, which became the sole basis for the only damages awarded by the jury (other than to the named plaintiff).[14]

At one point, during the transient agreement of class counsel and the trial court to subsequent claims proceedings, they appear to have come to some realization of the scale of the distortion created by conflating the common and individualized issues. In the end, however, the latter were unceremoniously blended back into the collectivized treatment, apparently under the force of the driving class-action rubric. The result

14. Approximations and extrapolations are frequently the basis for class action *settlements*. *See, e.g., City of Detroit v. Grinnell Corp.*, 356 F.Supp. 1380, 1385 (S.D.N.Y.1972) (explaining that an "evaluation of the proposed settlement ... requires an amalgam of delicate balancing, gross approximations, and rough justice"), *rev'd in part on other grounds*, 495 F.2d 448 (2d Cir.1974). However, the settlement context, involving a consensual resolution of affairs, is far different from the adversarial trial setting. Indeed, it is the difficulties of proof facing plaintiffs, and the scale of potential liabilities faced by defendants should they go to trial, which often provide the incentives for consummation of settlements.

Again, it may well be that, as a matter of social policy, some or all of the techniques and philosophies pertaining to class action *settlements* should be transported into the *trial* context. My main point here is that, undisputably, the approval of the class action device as acceptable procedure did not accomplish such a substantive change in Pennsylvania. *See supra* Part I. Moreover, and again, in any such substantive decision making, separation of powers considerations and the constitutional interests of affected defendants obviously merit careful consideration. *See id.*

Professor's Erbsen's overview perspective is again illuminating:

"Ad hoc lawmaking" occurs in class actions when courts attempt to devise substantive and evidentiary shortcuts around management problems that dissimilarity imposes on the resolution of otherwise similar claims. For example, courts will ... bend the rules of evidence and alter burdens of proof so that contested facts can be resolved on a common rather than individualized basis[.] ... Nothing inherent in the class action device distorts substantive or evidentiary rules in this manner, but certification has that practical effect when judges try to manage the dissimilar aspects of class members' claims.

Erbsen, *From "Predominance" to "Resolvability"*, 58 Vand. L.Rev. at 1012–13.

was a trial at which class members' plainly individualized experience with out-of-pocket expenditures was simply glossed over. As developed above, however, such blurring of the substantive requirements of the law of damages is plainly outside the contemplation of our civil procedural rules. *See supra* Part I. Furthermore, I agree with KMA that the perversion of expressly limited procedural rules to accomplish unauthorized substantive objectives impacts upon a defendant's due process rights. *See* Brief for KMA at 28–32. *See generally* Erbsen, *From "Predominance" to "Resolvability"*, 58 VAND. L.REV. at 1024 ("Class certification is . . . proper only if the court has a plan for eventually reaching an adjudicated or negotiated judgment that reflects the parties' rights under controlling law.").

I recognize that the record of this case creates the impression that purchasers of Sephias in the relevant time period sustained injury on account of a poor brake design and that the amount of the damages awarded to each individual class member appears to be modest. Thus, there may be a sense that the jury verdict in this case serves a "rough justice" and, as such, should not be disturbed. Result orientation in the law, however, yields its own set of perverse consequences, not the least of which is the silent dilution of the consistency, predictability, and fundamental fairness which are aspirations of the American judicial system. *Cf.* Erbsen, *From "Predominance" to "Resolvability"*, 58 VAND. L.REV. at 1037–39 (discussing the deleterious impact of ad hoc lawmaking in class action proceedings on democratic legitimacy and concluding that "[a]llowing courts to bend substantive rules to the procedural needs of particular cases is . . . inconsistent with the normal process of rulemaking and prone to prioritize the welfare of litigants over broader social welfare with undesirable distributive consequences").

Finally, Appellees forcefully contend that KMA's attorneys did not do enough to bring their criticisms to the attention of the trial court, and the majority credits such argument. *See* Majority Opinion, at 438–40, 34 A.3d at 41–42. My response is twofold. First, I do not believe the majority opinion in this

case will be read as an error-review, issue-preservation decision.[15] Rather, it will likely be advanced as supporting the proposition that Pennsylvania takes an unconventionally liberal approach to class certification and collectivized treatment of individualized issues in aggregate litigation. Second, the record is replete with objections on KMA's part to: the class certification decision; the expert testimony upon which the hypothesized class-wide out-of-pocket expenses was based; and the trial court's failure to require individualized proof for individualized claims. To me, this case should not turn on waiver.

In summary, left to my own devices, I would vacate the verdict and overturn the class certification order on its terms. I would also highlight the evaluative process which I believe should be required from the outset to shape the course of broad-scale, aggregate litigation likely to span the better part of a decade. I do not believe justice is served by insulating this verdict in reliance on the discretionary aspect of certification decisions, thus extending a liberality which yields trials where substantive requirements are subject to dilution and non-enforcement without substantive justification.

---

**15.** Responsively, the majority does say that its opinion is so confined, in relevant part. *See* Majority Opinion, at 440 n. 27, 34 A.3d at 42 n. 27. Nevertheless, the majority decision sanctions the certification of a broad-scale class in circumstances in which there was no ostensible plan for appropriate treatment of individualized issues, while at the same time cataloguing the incongruities, missteps, and (in my view) unfairness which resulted. While the majority places the onus upon defendants to provide some greater critique of class certification efforts, in my view, the need for individualized treatment of some elements of the plaintiffs' claims was obvious from the outset of this case (and KIA's objections were sufficient to identify the problem, in any event). Moreover, to prevent similar disorder in future class action cases, I believe the Court should take this opportunity to place the burden upon

proponents of class treatment to advance an appropriate management plan.